246

## UNITED STATES v. KEOUGH.
### No. 8028.

District Court, D. Nevada.
Feb. 17, 1931.

H. H. Atkinson, U. S. Atty., and George A. Whiteley, Asst. U. S. Atty., both of Reno, Nev., and George A. Montrose, Asst. U. S. Atty., of Carson City, Nev.

Charles L. Richards, of Reno, Nev., for defendant.

NORCROSS, District Judge.

This is a proceeding upon a complaint for removal of defendant to the District of New Jersey based upon a second indictment returned by the grand jury of that district on the 17th day of November, 1930, charging the defendant Keough with others in count I with the crime of conspiracy to use the United States mails to defraud, and in counts II to XVII, inclusive, with so using the mails. Hearing was had upon objections presenting the question of probable cause for removal.

A similar complaint upon a prior indictment was considered upon objections raising the same question. Upon hearing, the objections were sustained, the court, however, reserving jurisdiction to further consider the question.

The indictments considered upon the present and former hearing relate to alleged use of the mails to defraud in connection with the sale of stock of the New Mexico Copper & Manganese Corporation, a Colorado corporation with principal office at the city of Denver. The company's mining properties are in New Mexico.

The several persons named as defendants are James J. Wallace, George Clayton, Alfred Leonard, Charles Beadon, George C. Keough, George P. Goodier, Charles A. Duren, Warren N. Withington, Richard Schaeffer, and Murray Porter. The defendants other than defendants Keough and Goodier appear to be residents of the state of New Jersey, and in some way directly connected with the firm of Wallace & Company, a firm or association engaged in the sale of the stock of the said mining company, with offices at Jersey City. The defendant Goodier is president of the mining company and a resident of the city of Denver.

The indictment is lengthy, but the gist of the charge of conspiracy to use and the use of the mails to defraud may be briefly summarized as follows:

That the defendants should establish at Jersey City, N. J., an office or place of business under the name and style of Wallace & Company purporting to be for the legitimate dealing in stocks and other securities, and for the publishing and circulating of market letters and other literature containing information concerning stocks and securities under the general name and title of "The Tape & Ticker," and particularly the circulating of what purported to be true and reliable information concerning the stocks and securities of the New Mexico Copper & Manganese Corporation. That the defendants should employ one James P. Kane at a stated salary with intent that it should be communicated to the victims that he was the person through whom sales of stock would be made. That an option should be given by the New Mexico Company to said Kane to purchase 1,000,000 shares of the treasury stock of the said mining company within one year, not less than 20,000 shares to be purchased monthly, at the price of 25 cents per share, the said Kane then to give a similar option to said Wallace & Company. That letters and communications were to be prepared and addressed to Wallace & Company over the name of the New Mexico Copper & Manganese Corporation containing extravagant and untrue statements regarding the property and operations of the said mining company, with intent that the same should be published and communicated to said victims by Wallace & Company by means of letters and other writings and

the medium of the said "The Tape & Ticker." That the defendants should from time to time fraudulently order sold upon the Reno Stock Exchange, and purporting to be sold on account of and in the name of the said James P. Kane, various amounts of stock of said mining company at prices progressively increasing, artificially and arbitrarily fixed and determined in advance, and pretend that the same were open sales legitimately made on said exchange, and should thereupon communicate to said victims such price and pretended price at which the said sales and pretended sales had been made. That upon inquiries being made of the exchange defendant Keough should communicate with said victims, making fraudulent statements purporting to be from disinterested mining stockbrokers that large amounts of stock had been handled for the public at prices to be therein quoted, and that the said mining company had been in successful operation for several years, was shipping large amounts of ore daily which brought large returns to the company and its stockholders, and that the prospects were excellent for it also to become a large copper producer. That the said Reno Stock Exchange was not an active and reliable stock exchange, but upon the contrary an inactive and moribund organization largely controlled by defendant Keough. That during the year 1929 the said mining company was not actively operating any mines producing ore, nor prosecuting development work. That at no time was the stock of said mining company a good purchase for the said victims in any amount above 25 cents per share.

From the indictment it appears that the offenses charged grew out of or were based upon a contract or agreement between the officers of the mining company and Wallace & Company, whereby prior to May 1, 1929, there was given to one James P. Kane an option to purchase 1,000,000 shares, apparently half of the capital and all the treasury stock of the mining company, for 25 cents per share, provided such stock be sold within one year. To effect the sale of this stock to individual purchasers throughout the United States at prices apparently ranging around ten times the option price was the purpose to be accomplished. The office of James P. Kane was located in Boston. Kane, who was not made a defendant, testified upon the hearing as a witness for plaintiff.

For some time prior to the events involved in the indictment, as appears from the evidence, there had existed at Reno, Nev., a mining stock exchange known as Reno Stock Exchange, which was incorporated under the laws of the state of Nevada. The defendant Keough was a member of that exchange, and at the times in question, if not an officer thereof, largely responsible for the control and direction of its affairs. Comparable to mining stock exchanges existing in the more populous centers of the mining states, it was a small institution.

At the hearing the plaintiff called William A. Cueman as a witness, who testified that he was a postal inspector residing at Jersey City, N. J.; that he called at the office of the defendant Keough at Reno, Nev., on January 27, 1930, and finding him absent left word for him to call upon him at the post office; that later the defendant called as requested, stating he was Mr. Keough. This testimony was offered for the purpose of identification, which question was conceded. Plaintiff also offered a certified copy of the indictment, and rested.

Upon behalf of defendant the records and files of the Reno Stock Exchange relating to the listing of the New Mexico Copper & Manganese Corporation upon that exchange were submitted. The defendant Keough testified that in June or July, 1929, the defendant Withington, with whom he had no prior personal acquaintance, called at his office at the Reno Stock Exchange and took up with him the matter of listing on the exchange what he stated to be a "legitimate" mining corporation; that it owned considerable property and was a producer; and that further details and reports would be received from the president of the company. At that time defendant Withington was given a blank application form provided by the exchange for such purpose. Defendant Keough further testified that he was advised by defendant Withington that as sales of stock were made, notification of the same would be made by James P. Kane. A membership in the Reno Stock Exchange was taken out in the name of James P. Kane. The arrangement made with Withington, according to defendant Keough, was that Keough & Company was to receive the regular broker's commissions on all sale transactions received from or made to James P. Kane.

On July 22, 1929, as appears from the records of the Reno Stock Exchange, the defendant Goodier as president of the New Mexico Copper & Manganese Corporation filed an application in regular form for the listing of the stock on the Reno Exchange. Accompanying the application were certified copies of the articles of incorporation, record

248

title to and leasehold interest of the company in mining properties in New Mexico, a photostatic copy of a mining engineer's report upon the property, a letter of the president of the company giving a general description of the property, workings, etc., and among numerous other matters stating:

"We have been operating these properties for the past six years and our aggregate tonnage of manganese shipped is over three hundred thousand gross tons making a general average of fifty thousand gross tons per year."

Accompanying the application was also a "Profit and Loss statement," showing "gross ore sales $213,447.59," a "gross profit $160,-307.11," which "less items of expense" left apparently a net profit of $24,563.93. To this was added a certificate of the president of the mining company reading:

"I hereby certify the above a true statement of the profit and loss statement in connection with the operation of the property over the last eight months of operation."

There was also a "Statement of Assets and Liabilities" showing "Equipment of the stated value of $30,500," "cash in bank $2,-500," and total assets, including "Properties," $2,033,000. The "liabilities" were given as "Authorized capital stock, $2,000,000.00, less stock in treasury $1,000,000.00."

In practice defendant Keough would receive telegrams daily from James P. Kane advising him respecting sales, the price per share, and the number of shares, which Keough would post or cause to be posted as sales having been made on the Reno Exchange, for which he charged and received the usual broker's commission of one per cent. An exhibit introduced by the plaintiff on cross-examination of defendant Keough is a statement, dated August 31, 1929, entitled: "Sales transacted by George C. Keough & Co., Inc. for J. P. Kane, 89 Broad Street, Boston, Mass. week of Aug. 26th to Aug. 31st, Inc." The statement appears to contain a manifest error which when allowed for shows sales aggregating 11,000 shares for an aggregate sales price of $27,155. From this it would appear that if the statement represented an account of actual sales to purchasers, that after paying defendant Keough his commission and paying the company 25 cents per share on the option contract, there would remain for Wallace & Company approximately 90 per cent. of the total proceeds.

The only overt act charged in the conspiracy count of the indictment as having been di-

rectly committed by defendant Keough alleges that on or about August 22, 1929, Keough mailed a letter at Reno, Nev., addressed to Harold P. Gabele, Massillon, Ohio, "in which it was stated in part, 'there seems to be a ready sale at the bid price for this issue any time it is offered.'" Upon cross-examination the original of this letter was offered in evidence by the plaintiff, the body of which reads:

"Your letter of inquiry to the Reno Stock Exchange regarding New Mexico Copper and Manganese stock has been handed to our firm by the secretary of the Exchange for answering.

"This was done for the reason that our firm has been handling both the sales and purchases of the above named issue. Today sales amount to 2100 shares, 1100 shares sold at $2.25 and 1000 shares sold at $2.30.

"We would be glad to execute your orders for you either way on this stock; and either by mail or wire.

"There seems to be a ready sale at the bid price for this issue any time it is offered. Kindly let us know your desires in regard to the stock you own at your earliest convenience."

There appears from this letter a readiness to execute orders "either way." This expression is instructive, taken in connection with the fact as shown by the testimony both of the defendant Keough and plaintiff's witness Kane, that money was sent from time to time by Kane to Keough & Company to take care of not only the commissions charged by Keough & Company, but for the purchase of stock offered for sale on the exchange otherwise than through Kane. It is apparent from the letter in question that Keough was ready and willing to sell stock to Kane which had apparently been purchased through Wallace & Company.

Plaintiff also introduced on cross-examination a letter from Keough & Company, signed by defendant, of date August 26, 1929, addressed to the said Gabele, replying to another letter, and in part reading:

"Enclosed you will find a newspaper clipping stating the mines condition and development of the New Mexico Copper and Manganese Co. We have handled the above named issue for this company since July 26th, and find them very reliable in their business dealings.

"Today this stock sold on the Reno Stock Exchange 800 shares at $2.25, 800 shares at $2.30, 500 shares at $2.35 and 700 shares at

$2.40 and it looks like it was scheduled for a much higher figure.

"Any time we can be of service to you in either the purchase or disposal of any mining issue listed or unlisted, we are at your service."

The newspaper clipping referred to was from the mining news page of a daily newspaper published at Reno, and was a statement concerning the mining company's property in New Mexico, apparently made up from the statements furnished by the company and filed with the Reno Stock Exchange.

On August 30, 1929, Gabele again wrote to Keough & Company that he wished to sell 200 shares "at the current market price," which he stated, from the bulletin he had received of date August 27th, "was $2.40 per share." On September 4th defendant Keough sold the stock for Gabele at $2.45 per share to James P. Kane.

Plaintiff also offered in evidence on cross-examination a letter of date September 20, 1929, from George C. Keough & Company, Inc., signed by defendant Keough, addressed to Miss Mabel E. Bardsley, New York Mills, N. Y., and purporting to be in reply to a letter addressed to the Reno Stock Exchange. With the exception of a statement relative to stock sales, and other statements hereinafter noted, the letter is a recital of statements appearing in the letter of the president of the mining company, profit and loss statement, and the report of the mining engineer filed by the company with the Reno Stock Exchange.

There are a couple of misstatements in the letter to Miss Bardsley which should be noted. The letter states:

"The New Mexico Copper and Manganese Co. has been in operation six years. * * * During that time they have shipped an aggregate of over 300,000 tons. * * * It is now shipping 500 tons daily, its profits for the last eight months of operation up to July 1929, was set at $25,201.19."

The New Mexico Copper & Manganese Corporation was not organized until January 29, 1929. Prior to that time the properties appear to have been operated by the defendant George P. Goodier and a copartnership consisting of the said Goodier and two others under the firm name or style of "Manganese Leasing Company." The property and interests of Goodier and of the partnership were transferred to the said New Mexico Company. The financial statements and ore production recited in statements filed with the Reno Exchange covering a six-year period

necessarily largely, if not entirely, related to the prior history of the properties acquired by the company. The erroneous statements could easily have been made inadvertently in view of the wording of the letter of the president of the company to the secretary of the Reno Exchange. While a corporation was organized to take over title to the properties, the personal control and management thereof appears to have remained the same. The statements filed with the exchange were for the purpose of showing the company was a meritorious mining company and so entitled to have its stock listed. For such purpose the date of the corporation was not so important, and one might entirely overlook giving that consideration in replying to the letter of Miss Bardsley.

In view of the statements contained in the Bardsley letter, and as having a bearing upon the question of probability of defendant Keough's participation in the alleged fraudulent acts and conspiracy it will be instructive to here quote excerpts from the said engineer's report:

"Recommendations and Conclusions.

"With the necessary capital available, to carry out a comprehensive program of exploitation, your plan should be to expand as fast and as largely as possible your present output of manganiferous iron ores.

"A new tunnel should be driven in order to reach the ore bodies · '* * * at a lower level; such a tunnel would afford you a cheaper exploitation * * * on a larger scale.

"Also a large electric-shovel-mined quarry * * * could likely be created on the Comanche ore body, on the Fierro No. 4 claim, in a short time and at a relatively low cost.

"It would also be greatly to your advantage to install a milling plant, * * * and thereby raise the grade of the ore enough to permit you to * * * broaden greatly your possible market and as a result to considerably increase your production.

"At the same time, * * * your program should comprise also an aggressive campaign of exploration of the copper ores, with the hopes that it should be rewarded by some exceptionally valuable discoveries."

There is nothing in this case to indicate that defendant Keough was not justified in reasonably assuming the correctness of the reports, letters, and documents filed with the exchange relative to the merits of the mining

company. It appears from the indictment that the stock of the company also had been listed on the Denver Stock & Mining Exchange.

Assuming that the statements concerning the mining property filed with the Reno Stock Exchange relative to past operations and future prospects were substantially true, and the proceeds of treasury stock sales less reasonable expenses were to go into the company's treasury for the development recommended, some difficulty might be found in determining at what price per share sales would be indicative of fraud.

Keough testified he knew nothing of the fraud as alleged other than in respect to the sales or purported sales of stock on the Reno Exchange; that he had never seen but one copy of "The Tape & Ticker," and that had been mailed to him by some person who had received it; that he had no arrangements with Wallace & Company; that he had not made sales of the stock. To the question propounded by the United States Attorney, "What was the object of their wiring you to make sales?" he answered: "That was their business, and they had a membership on the Reno Stock Exchange; their stock was listed on the Reno Stock Exchange, and the sales made, if they were made in New Jersey, New Orleans or San Francisco, they were entitled to be put on the board of the Reno Stock Exchange."

The principal question on this hearing concerns defendant Keough's transactions with J. P. Kane relative to sales or purported sales of stock on the exchange. It is manifest that these reported sales were used by Wallace & Company as one of its strongest arguments to induce investments in the stock at prices indicated by the quotations.

On August 2, 1929, James P. Kane wrote a letter to George C. Keough & Company reading as follows:

"I wired you $500 yesterday and also instructions on trades. Henceforth I will wire you each night by night letter the transactions for the following day which I trust you will put through accordingly. I will give you the price figures in total and trust you will split the transactions up in smaller lots on your exchange so as to make the issue active trading. I have the handling of N. M. C. & M. on this end, and all transactions will go through me. I wish you would wire me immediately of all bids and offers made through sources that may materialize on the floor of your exchange and I will take care of them accordingly. It is our intention to ship you some certificates in the next few days, and make other arrangements for a business like handling of your account."

On the same date Kane wired the following dispatch:

"Make sales today 3600 at one-seventy 2000 at one-eighty. Break these transactions into sales of one two and five hundred share lots. Close at one-eighty."

Defendant Keough admitted receiving telegrams of the nature of one appearing to have been sent by Kane, of date August 26, 1929, reading:

"Make sales today 2800 at 2.25, 2.30, 2.35, 2.40. Close at 2.40."

Defendant also recalled that he had received a wire from Kane of date August 7, 1929, to the effect, "F. E. Bettenger holder of N. M. write or wire him that stock is active and looks going to much higher prices wire tenor of his communication," and that he replied to Kane by wire reading, "Bettenger wire for quotations and activity answered as you instructed."

It must be conceded that the stock transactions between Kane and Keough were not regular sales as that expression is understood upon a stock exchange. They may, for the purpose of this hearing, be regarded, as alleged in the indictment, as "wash sales." As such sales bear upon the question of probable cause for removal, it will be instructive to consider the same in the light of the testimony of James P. Kane, called by the plaintiff as a witness in rebuttal.

Kane testified that he established business relations with Keough through defendant Withington. He testified: "At Wallace & Company's instruction Withington was sent west to make arrangements for trades to be made through me. After advising Mr. Keough that trades through me were to be accepted, he then told me how to word the wire, and after the first wire Wallace & Company would telephone daily the wires to be sent." Kane further testified that he sent money to Keough to pay commissions and for the purchase of stock; that Keough was instructed by him to purchase stock offered through other sources for sale on the exchange; that the stock quotations he sent to Keough he sent for the purpose of having him put them on the Reno Exchange; that as far as he knew they were sent as sales to be made in Reno; that he notified Keough it was not necessary to report the transactions unless they were not made; that he paid commissions to Keough "for transactions made as per the wires";

that "there would be no way of my knowing whether they (the wires) were fictitious or not"; that he did not know of any scheme to defraud the public until it was stopped; that he did not know of a membership in his name on the Reno Stock Exchange, but it was possible such membership could have been purchased and he not know of it.

The testimony relative to transactions between defendant Keough and Wallace & Company is substantially as follows: Kane testified that he had sent Keough "twenty-five hundred or three thousand dollars, but not more than that. * * * I notified them (Wallace & Company) that Keough needed more money, and they would send the money to him." Keough testified to having "at one time received a wire from James P. Kane which read something like this, 'that Wallace & Company are wiring'—I think it was '$5,000—credit the account of J. P. Kane.'" Keough testified that on September 4, 1929, he received a wire from Wallace & Company, New York, transmitting $5,000, and that he "notified both parties" respecting the receipt of this money.

The amount of money—approximately $8,000—sent to Keough was to cover not only Keough's commissions but to pay for stock offered for sale on the exchange and purchased by Keough for the account of James P. Kane. The amount of the stock so purchased does not appear, but Keough testified that stock was sent to local banks and brokers for sale upon the exchange; that he "bought from people all over the United States. * * * J. P. Kane was the buyer of all the stock that I purchased through the country."

Concerning the call made upon defendant Keough by the postal inspector, Mr. Cueman, on January 22, 1930, defendant testified:

"He * * * wanted to know if I would let him see or have access to my records with Wallace & Company. I told him that I had no dealings with Wallace & Company. 'Well,' he says, 'I would like to see what you have got with everybody and all concerned on the New Mexico Copper & Manganese Corporation.' * * * I got him the records, put him in an office by himself, a private room, and dug out everything I had—all the records. He asked me could he take them over to his office in the post office. * * * I let him take the records * * * perfectly willing that he should have them."

Concerning the same matter, Mr. Cueman, called as a witness for defendant, testified that defendant gave him the records "voluntarily and freely."

Upon a hearing for removal where the defendant raises the question of probable cause, two questions of prime importance are presented. Where an offense is charged to have been committed within a district in another state, the court of the district where a defendant so charged resides or may be found should readily direct such removal in the absence of a showing upon the part of defendant of want of such probable cause. Upon the other hand, as said by the Supreme Court of the United States in dealing with a similar question, "To require a citizen to undertake a long journey across the continent to face his accusers, to incur the expense of taking his witnesses, and of employing counsel in a distant city, involves a serious hardship to which he ought not to be subjected," [Hyde v. Shine, 199 U. S. 62, 78, 25 S. Ct. 760, 762 (50 L. Ed. 90)] unless upon a review of the evidence submitted it appears that the defendant has failed to overcome the prima facie case made out from the indictment alone (Beavers v. Henkel, 194 U. S. 73, 24 S. Ct. 605, 48 L. Ed. 882; United States v. Mathues [D. C.] 284 F. 368), and such additional evidence as the prosecution may also submit. Hyde v. Shine, supra; Haim v. Mathues (C. C. A.) 19 F.(2d) 22; Hardy on Removal, 48.

The law governing in a proceeding for removal is concisely stated in an excerpt from the book "Removal of Federal Offenders" by Hardy, reading:

"While to effect removal, it is only necessary, therefore, that a probability of guilt be shown, on the other hand, a discharge is authorized only when the defendant shall have removed 'all reasonable grounds of presumption of the commission of the offense.' As it is elsewhere expressed, the prima facie case of probable cause must be overcome by rebuttal 'so clear and convincing as to leave no reasonable room for doubt.' If upon an inquiry such as that obtaining in removal proceedings, said Marshall, quoting the words of Blackstone, 'it manifestly appears that no such crime has been committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only' is it lawful totally to discharge him. Probable cause does not exist, it has been said, when 'a substantial doubt' is shown; when the record is 'barren of all evidence,' or shows 'an entire absence of evidence' against the defendant." " * * * Where the net result of the evidence is to raise a doubtful or controverted

question of fact, the court to which application for removal is made should not weigh the evidence and settle that issue. In every such case removal should be made and those questions referred to the trial court." Page 54.

▇ The court is of opinion that the defendant has made out a case of want of probable cause within the rule quoted. As before stated, the gist of the conspiracy to use and the use of the mails to defraud was to effect the sale of stock in the New Mexico Copper & Manganese Corporation to individual purchasers at prices greatly in excess of the option price to be paid the company. There is nothing in the evidence submitted indicating that the defendant Keough ever knew or heard of this option price of 25 cents per share prior to the time of the call upon him by the postal inspector. When defendant Withington called upon defendant Keough in July relative to listing the stock on the Reno Exchange, ostensibly he was acting on behalf of the mining company. From statements made, and particularly from letters and documents filed upon the part of the mining company with the exchange, defendant Keough was justified in the assumption that the company possessed a producing mine, and with sufficient capital had promise of becoming a large and profitable mining property. Keough apparently had no reason to assume that stock sales effected through James P. Kane were not on account of the mining company, and that the proceeds of such sales, less reasonable commissions and expenses, were to go into the mining company's treasury. There is nothing to indicate that Keough had knowledge that Kane was a mere employee of Wallace & Company. It is not reasonable to assume that Keough knew of the contractual relations between the mining company and Wallace & Company respecting the option, and so knowing would agree with the members of the latter firm to perform a most important part in a known fraudulent scheme, and accept for his contribution substantially but a hundredth part of the spoils of the nefarious enterprise. It must be conceded that the carrying out by defendant Keough of the telegraphic directions received from Kane respecting stock sales to be posted on the Reno Exchange did not constitute regular stock exchange transactions. It would not follow, however, from these transactions alone that Keough knew or should have known of the scheme to defraud as alleged in the indictment. It is charged in the indictment that these were "wash sales." We do not find that the courts have defined or recognized a definition of so-called "wash sales." The Century Dictionary gives the following definition:

"A fictitious kind of sale, disallowed on the stock and other exchanges, in which a broker who has received orders from one person to buy and from another person to sell a particular amount or quantity of some particular stock or commodity simply transfers the stock or commodity from one principal to the other and pockets the difference, instead of executing both orders separately to the best advantage in each case, as is required by the rules of the different exchanges."

The transactions involved in this case do not fit this definition. It is claimed that stock is sometimes sold upon a stock exchange when the seller and ostensible purchaser are the same person, company, or corporation; that this procedure is not uncommon following the listing of a new company on an exchange; that it is sometimes done for the purpose of creating a market for the stock, usually relying on quotations appearing in the public press to stimulate public interest. Whether the character of sales here involved might be regarded as in some such category is not important to determine. Whatever their character they were not commendable. So far as defendant Keough is concerned, however, there is nothing to indicate that he knew that such sales or pretended sales which he was posting upon the Reno Stock Exchange were for the purpose of aiding Wallace & Company to dispose of stock upon which they held an option, to purchasers at prices greatly in excess thereof, and that such company, and not the mining company, was to be the recipient of the greater portion of the proceeds of sales to individual investors.

As said by the Circuit Court of Appeals for the Sixth Circuit in Meehan v. United States, 11 F.(2d) 847, 849:

"Whenever there is affirmative proof, unchallenged except by the indictment, demonstrating lack of guilt, removal should be denied; if the conclusion of no probable cause is put in any substantial doubt by proofs in addition to the indictment, the removal should be made."

In the case at bar the testimony of witnesses produced upon the part of the prosecution tends to confirm the position or contention of defendant of lack of knowledge of or participation in the offenses as charged in the indictment.

The objections are sustained, and the warrant for removal denied.