**AVONDALE SHIPYARDS, INC.,**
**Plaintiff,**

v.

**The VESSEL THOMAS E. CUFFE et al., Defendants.**

**No. 74–93.**

United States District Court,
E. D. Louisiana.

June 15, 1977.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

Edward J. Koehl, Jr., Robert B. Acomb, Jr., New Orleans, La., for Avondale Shipyards, Inc.

Edward S. Bagley, New Orleans, La., George L. Waddell, James D. Boughey, San Francisco, Cal., for Pacific Far East Line, Inc.

Curtis R. Boisfontaine, New Orleans, La., John Martin, Philadelphia, Pa., for DeLaval Turbine, Inc.

Edwin O. Schlesinger, Moise S. Steeg, Jr., New Orleans, La., for Friede & Goldman, Inc., LASH Systems, Inc., and Jerome Goldman.

ALVIN B. RUBIN, District Judge:

This opinion concerns the motions for summary judgment with respect to the tort, indemnity and contribution claims of Avondale Shipyards, Inc. (Avondale), a shipbuilder, against Friede & Goldman, Inc., (F. & G.), the designer of the vessels that Avondale built for Pacific Far East Line, Inc., (PFEL), and against Jerome Goldman (Goldman), President of F. & G., and himself a participant in the design of the vessels, and, arguably in the design of the propulsion system, including the main reduction gear, and the portion of the vessels' structure supplying the propulsion system.

## I.

## BACKGROUND

In November, 1967, Avondale, PFEL and the Maritime Administration (Marad) entered into a contract for the construction of six vessels of a kind never before built. Known as LASH (lighter aboard ship) vessels, they were designed by F. & G., who acted at least in part through Goldman, to transport cargo in barges stacked within the hull. Cranes were to be used to lift fully loaded barges into the vessel, and to unload them in like manner at their destination.

In June, 1971, the first LASH vessel built for PFEL, the Cuffe, underwent sea trials. The vessels were built with a specially designed propulsion system whereby the power of the engines was transmitted to the propellers through reduction gears. At the sea trials, it became evident that there were some problems in the operation of the vessel's main reduction gear. After some re-

pair work to attempt to rectify the operation of the gear, the Cuffe was delivered to PFEL in July, 1971. In September, PFEL's second ship, the Golden Bear, was delivered. By October 9, 1971, problems were being encountered in the main reduction gears in both vessels, and in three others of like design that had been produced for another purchaser, Prudential Grace. A change in the oil flow system was made, apparently upon the suggestion of the manufacturers of the propulsion system, DeLaval Turbine, Inc., (DeLaval).

In March and May, 1972, PFEL took delivery of two additional ships that proved trouble free. The drive shaft gears on these two were specially aligned by a procedure known as dot alignment. In August, 1972, the tenth LASH vessel was tendered for delivery to Prudential Grace. The gear on this vessel had been dot aligned, and it is arguable, and assumed for present purposes, that this vessel therefore was capable of operating properly.

F. & G., Avondale, DeLaval, Prudential Grace and PFEL had various conferences and exchanged correspondence about the gear problems and about many other matters pertaining to ship design, construction, and operation. Apparently, apart from the construction problems, Prudential Grace was not in a financial condition to take delivery and make final progress payments, at least until the Internal Revenue Service issued a ruling favorable to its proposed financing arrangement. Hence, Prudential Grace is portrayed here as seeking to find excuses to decline delivery.

Perhaps inspired by these motives, on August 21, 1972, Prudential Grace wrote Avondale, "It appears increasingly certain that the main reduction gear and/or hull supporting structure may be of inherently faulty design and/or manufacture and/or construction. This conclusion has been forced on us by the failure of every corrective step, every experiment, and all the tinkering engaged in by the contractor."

Whatever the motives for writing this letter, in the light of the prior dealings between PFEL and Avondale, and the interrelationship of the problems in the two groups of vessels, this bald assertion that the fault lay in the design or manufacture of the reduction gear was enough to put both PFEL and Avondale on notice of the possible nature and cause of the problem. The letter was received by Avondale in August 1972 and was in PFEL's hands no later than November 1972.

Beginning late in 1972, Avondale commenced making substantial alterations, called retrofitting, in the PFEL vessels. In May, 1973, it proposed a contract modification to PFEL by which it would be reimbursed for the expenses involved in the retrofitting, but an agreement was never reached. On January 11, 1974, Avondale filed suit against PFEL for the amount it claimed: $11,740,869.42. On April 30, 1974, PFEL counter-claimed against Avondale, seeking damages resulting from Avondale's alleged breach of its contractual obligations and alleged negligent construction. It also filed a third-party action against DeLaval for breach of contract, breach of warranty, negligent construction, and product liability, and against F. & G. for breach of the design contract and of the technical service contract. On June 24, 1976, more than two years later, Avondale filed a third-party complaint against F. & G., Goldman, and LASH Systems, Inc., the holder of the patent on the LASH design.[1]

The present motions challenge the claims of Avondale against Goldman and F. & G., which sound in indemnity, contribution and tort. Both of these third-party defendants contend that the facts of this case cannot, as a matter of law, give rise to a claim for implied contractual indemnity under *Ryan Company v. Pan-Atlantic Steamship Co.,* 1956, 350, U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and its spawn, nor to an action for "active-passive tort" indemnity under the doctrine of *Tri-State Oil Tool Industries,*

1. Summary judgment has been granted in favor of LASH Systems, because Avondale has been unable to state facts and circumstances that would give rise to liability on the part of that defendant.

*Inc. v. Delta Marine Drilling Co.,* 5th Cir. 1969, 410 F.2d 178. They further contend that any causes of action sounding in contribution or in tort are barred by laches. Let us consider these contentions separately.

## II.

### IMPLIED CONTRACTUAL INDEMNITY AGAINST JEROME GOLDMAN

*Ryan,*[2] *supra,* and its spawn[3] are predicated upon breach of a contractual duty, albeit an implied one, and not upon tortious conduct.[4] Although courts in cases subsequent to *Ryan* have held that privity of contract between the indemnitor and indemnitee is not necessary,[5] the *Ryan* cause of action for indemnity is based upon the breach of an implied contractual term of workmanlike performance. Cases applying the *Ryan* doctrine traditionally involve contractual privity; *Ryan* liability has been imposed absent privity only where the contract was made by a non-vessel owner for services to a vessel.

Because the original construction contract and technical service contract relating to ship construction are non-maritime contracts,[6] any warranty of workmanlike performance in those contracts must be implied by state, and not maritime, law. The *Ryan* doctrine has been extended to non-maritime cases in some jurisdictions, but not Louisiana. *General Electric Co. v. Cuban Am. Nickel Co.,* 5th Cir. 1968, 396 F.2d 89, 91–97. See Note—Indemnity—Tort and Contract Theories Under Louisiana Law, 1970, 44 Tul.L.Rev. 408, 412, note 22.

If, therefore, Louisiana law applies, it is evident there was no warranty from Goldman to Avondale. If, on the other hand, the case is guided by general maritime law, then we arrive at the same port. See *Watz v. Zapata Off-Shore Co.,* 5th Cir., 1970, 431 F.2d 100, 120. As the Fifth Circuit has recently stated, "We have consistently refrained from extending the *Ryan*-type indemnity 'beyond those controversies . . . which necessitated its formulation and justify its application.' See *In re Dearborn Marine Service, Inc.,* 5 Cir., 1974, 499 F.2d 263, 287. See also *Delta Engineering Corporation v. Scott,* 5 Cir., 1963, 322 F.2d 11; *Ocean Drilling & Exp. Co. v. Berry Bros. Oilfield Service,* 5 Cir., 1967, 377 F.2d 511." *Thibodeaux v. Texas Eastern Transmission Corp.,* 5th Cir., 1977, 548 F.2d 581, 585. See also *Loffland Brothers v. Roberts,* 5th Cir., 1967, 386 F.2d 540, 549 ("We are . . . extremely hesitant to extend the burden-

**2.** *Ryan* held that a stevedoring contractor's agreement to perform all of a shipowner's stevedoring operations included an implied obligation to stow the cargo properly and safely, and that the shipowner was therefore entitled to indemnity from the contractor for the amount of its liability to one of the contractor's stevedores for injuries sustained by that stevedore while unloading the ship.

**3.** See the cases discussed in Note, The Ryan Doctrine: Present Stature and Future Development, 1963, 37 Tul.L.Rev. 786.

**4.** According to the court in *Ryan,* 350 U.S. at 132–133, 76 S.Ct. at 237:

[T]he shipowner's action for indemnity here is not based merely on the ground that the shipowner and contractor each is responsible in some related degree for the tortious stowage of cargo . . . Such an action, brought without reliance upon contractual undertakings, would present the bald question . . . of the relative responsibility of the parties for the tort . . . Because respondent . . . relies entirely upon petitioner's contractual obligation, we do not

meet the question of a noncontractual right of indemnity . . .

**5.** See *Waterman Steamship Corp. v. Dugan and McNamara, Inc.,* 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169; *Crumady v. The Joachim Hendrik Fisser,* 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; *Whisenant v. Brewster-Bartle Offshore Co.,* 5th Cir. 1971, 446 F.2d 394.

**6.** Contracts for ship construction are not maritime and not within the admiralty jurisdiction. *The Francis McDonald,* 1920, 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245; *North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co.,* 1919, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510; *Hollister v. Luke Construction Co.,* 5th Cir. 1975, 517 F.2d 920, 921. According to *Bond v. F/V Mermaid,* S.D.Fla.1970, 311 F.Supp. 1013, an action by a naval architect for services, including design and supervision of ship construction, is not within the admiralty jurisdiction, hence not covered by maritime law.

some *Ryan* doctrine to situations not substantially similar to those which gave birth to the doctrine.")

Neither F. & G. nor Jerome Goldman had a contract with Avondale. Hence, neither could be held to have made a contractual warranty to Avondale. Whether an architect impliedly warrants his own workmanlike performance to the owner who employed him (here PFEL) presents a different question, and one that must ultimately be decided by this court when deciding F. & G.'s motion for summary judgment against PFEL. Compare *Creighton v. Karlin,* La. App.1969, 225 So.2d 288 with *Steel v. Aetna Life & Casualty,* La.App.1974, 304 So.2d 861.

Unlike a stevedore, wharfinger, or charterer, Goldman was not at any time in control of any vessel; Avondale had control of the vessels until they were delivered to PFEL. Although Jerome Goldman originated the LASH concept and participated in the design work undertaken by F. & G., he personally was not the architect who contracted with PFEL; F. & G. was. To extend the *Ryan* burden to the designer of a vessel would be to lose sight of its original intent and purpose, and cut free that doctrine from its jurisprudential moorings. Accordingly, Goldman is entitled to summary judgment against all indemnity claims predicated upon *Ryan.*

### III.

### ACTIVE–PASSIVE INDEMNITY AGAINST JEROME GOLDMAN

For reasons set out in the opinion of this court in *Bible v. Chevron Oil Co.,* E.D.La.1969, 308 F.Supp. 312, for jurisdictional purposes, a tort occurs where the impact of the act or omission produces injury. Thus, where a force giving rise to an injury on the waters originates on land, the tort is maritime. In *Jig the Third Corp. v. Puritan Marine Insurance Underwriters Corp.,* 5th Cir. 1975, 519 F.2d 171, the court found a maritime tort where negligent construction or defective design occurring on shore caused injury to the vessel while at sea. See also *Watz v. Zapata Off-Shore Co.,* 5th Cir. 1970, 431 F.2d 100, 112–114 *Oppen v. Aetna Ins. Co.,* 9th Cir. 1973, 485 F.2d 252, 256. Additionally, the circumstances giving rise to the alleged tort in this case have a significant relationship to traditional maritime activity as defined in *Executive Jet Aviation, Inc. v. City of Cleveland,* 1972, 409 U.S. 249, 268–270, 93 S.Ct. 493, 504–505, 34 L.Ed.2d 454. See also *In re Motor Ship Pacific Carrier,* 5th Cir. 1974, 489 F.2d 152, 154–155, cert. denied *sub nom., Union Camp Corp. v. Gypsum Carrier, Inc.,* 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235; *Union Oil Co. v. Oppen,* 9th Cir. 1974, 501 F.2d 558, 560–563.[7] An action for indemnity based upon a maritime tort is governed by maritime law. *Tri-State Oil Tool Industries v. Delta Marine Drilling Co.,* 5th Cir. 1969, 410 F.2d 178, 186. Therefore, although Louisiana law governs the issue of *contractual* indemnity, maritime law governs the issue of *tort* indemnity.

Under *Delta Marine, supra,* if a maritime tort is committed by two joint tortfeasors, and one is found to be actively negligent while the other is determined to be only passively so, the one whose fault is passive is entitled to indemnity from the active tortfeasor. See also *Wisconsin Barge Line, Inc. v. Barge Chem. 300,* 5th Cir. 1977, 546 F.2d 1125.[8] Therefore, Avon-

---

**7.** The Fifth Circuit has noted, "under certain circumstances and on familiar conflicts principles, a court applying the general maritime law might look to the law of a particular state when that state has strong contacts with the parties or other legitimate interests." *Jig III, supra,* 519 F.2d at 174; See also, *Watz v. Zapata Off-Shore Co., supra; In re Dearborn Marine Service, Inc.,* 5th Cir. 1974, 499 F.2d 263, 277, note 27. But where, as here, the allegedly tortious act or omission occurred during the shipbuilding process and results in injury on the high seas, the interests of admiralty outweigh those interests that any state might have.

**8.** The court, in *Wisconsin Barge, supra,* applied the general rule of indemnity provided by A.L.I. Restatement of Restitution, § 76:

A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is

dale would be entitled to recover from Goldman if it and he were found to be joint tortfeasors, and only Goldman was found to be actively negligent.

■ Avondale contends that, whether or not it was negligent, and, if so, whether its negligence was merely technical and passive, and whether Goldman's negligence was active, are issues that can be determined only by a trial on the merits. But if all that Avondale contends in the documents filed with respect to the motion is accepted as proved, and even if it is shown that Goldman individually was negligent in his design work, that would not entitle Avondale to indemnity from him. Goldman was not the architect. As to Avondale, whatever his responsibility to F. & G. or his role in that corporation, he was merely an employee of the architect, F. & G. No facts have been shown that would make him actively at fault and Avondale passively so. If Avondale is held liable to PFEL on the basis of its own independent negligence, or in negligently following the contract plans and specifications prepared by Jerome Goldman and F. & G., or in failing to correct errors and defects in them,[9] these would be active faults on its part.

■ The situation here presented must be distinguished from the one where a shipowner is held liable for the unseaworthiness of a vessel caused exclusively by the negligence of the indemnitor. See *Simpson Timber Co. v. Parks,* 9th Cir. 1968, 390 F.2d 353; *Lawlor v. Socony-Vacuum Oil Co.,* 2d Cir.

1960, 275 F.2d 599, cert. denied, 1960, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728. The shipowner liable for unseaworthiness is held regardless of fault; the negligence of the indemnitor is thus the sole active negligence. But where the party seeking indemnity is liable for its own negligence rather than for breaching an absolute duty to provide a seaworthy vessel or liable under a rule imposing vicarious or technical liability, the *Tri-State* doctrine is inapplicable. *Thibodeaux, supra; Horton & Horton v. T/S J. E. Dyer,* 5th Cir. 1970, 428 F.2d 1131, cert. denied, 1971, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441.

■ If Louisiana law governed the issue of tort indemnity, such indemnity would be available only in circumstances similar to those required under the *Tri-State* doctrine. *Appalachian Corporation v. Brooklyn Cooperage Co.,* 1922, 151 La. 41, 91 So. 539. Hence, the conclusion would be the same whether maritime or local law applies.

■ It is possible that Avondale might be held liable to PFEL without fault, on the basis discussed in Part V, below. For present purposes, we accept the thesis that it is possible that Goldman was actively negligent in causing a design error and that Avondale may be cast in judgment for that error without fault on its part because of its contract with PFEL. In that event, however, Goldman and Avondale would not be *joint tortfeasors.* Goldman would be liable to Avondale, but for negligence that triggered Avondale's *conventional* liability.

entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct.

The notes to the Restatement indicate that this provision may be applicable where the duty to pay is based upon a tort, but only where the liability of the indemnitee is purely technical. The only example of indemnity in a tort context cited is "where a servant innocently commits conversion in obeying orders of the master and has been required to pay damages therefor." In *Wisconsin Barge,* the trial court found that the indemnitee was not negligent nor the vessel unseaworthy, and that the indemnitor was the sole and proximate cause of the accident. The indemnitee had settled his claim with the plaintiff and tendered his rights of defense to the indemnitor. In the present

case, if Avondale is held liable it will be for its own active negligence. There is no basis for concluding that as between Goldman and Avondale, all liability should be discharged by Goldman. Hence, the predicate for applying this principle of law is lacking.

9. Avondale had considerable input and responsibility for vital areas of ship construction. They had a responsibility for "developing working plans" (Article IA of Construction Contract); for fleshing out conflicts in plans and specifications (Article IVA); as well as a general responsibility for translating the plans into a completed vessel. A host of affidavits indicate that Avondale did, in fact, participate in the design, selection and modification of key elements in the main propulsion system.

For the reasons discussed below, this would create a tort claim by Avondale against Goldman but not an indemnity claim. Accordingly, Jerome Goldman is entitled to summary judgment against all indemnity claims asserted by Avondale.

## IV.

### INDEMNITY AGAINST F. & G.

■ F. & G. stands in the same position as Goldman with respect to the claims for implied tort indemnity. A claim for *Ryan* implied indemnity as a term of a maritime contract will not lie because, for the reasons already given, there is no *Ryan* warranty of workmanlike performance from F. & G. to Avondale. Finally, there is no implied agreement between F. & G. and Avondale under Louisiana law, for F. & G. contracted only with PFEL. Its warranty, if any, express or implied, ran only to PFEL.

A claim for tort indemnity will not lie because Avondale's liability relative to F. & G. is neither vicarious nor technical. Accordingly, F. & G. is entitled to summary judgment against Avondale on all indemnity claims.

## V.

### TORT CLAIM AGAINST JEROME GOLDMAN AND F. & G. IF AVONDALE IS FOUND TO HAVE VIOLATED ITS GUARANTEE

■ PFEL has asserted a claim against Avondale for breach of contract based on Article 16 of their contract. This reads in part as follows:

ARTICLE 16. *Guarantee Period—Liability for Defective Work or Material.* [I]f at any time within six (6) months after the delivery of each of the Vessels, there shall appear or be discovered, any weakness, any deficiency, any failure, any breaking down or deterioration in workmanship or material furnished by the Contractor in performing the contract work, or any failure of any equipment, machinery or material, so furnished by the Contractor, to function as prescribed and as intended by the Plans and Specifications and this Contract (herein called "a guarantee deficiency"), such guarantee deficiency shall be made good, at the Contractor's expense to the requirements of the Plans and Specifications and this Contract . . . . .

If PFEL recovers from Avondale under this guarantee, then it would be possible for the trier of fact to conclude that the guarantee was violated without fault on Avondale's part, but as a result of negligence on the part of F. & G. or Goldman, or both. In that event, Avondale's claim against F. & G. and Goldman would be on the basis of a tort (negligence) committed by one or both of them that caused damage to Avondale (violation of its guarantee). This is the same kind of tort claim that will be discussed later in this opinion; the only difference is in the nature of the damage. Hence, it is governed by the same rules that apply to Avondale's other tort claims.

Neither F. & G. nor Goldman could be liable without fault under the products liability theory, see Restatement Torts, Second, § 402A, for neither of them was a manufacturer as that term is used in the products cases. *La Rosa v. Scientific Design Co.*, 3d Cir. 1968, 402 F.2d 937, 942–43 ("professional services do not ordinarily lend themselves to the doctrine of tort liability without fault").

If Avondale was not negligent, it will not be liable in tort, and it will not have an indemnity claim. If Avondale is liable without fault because of its guarantee, it is liable under a contract, albeit without fault, and would not be a tortfeasor; hence, it would not recover under the doctrine created for joint tortfeasors.

## VI.

### TORT CLAIMS AGAINST JEROME GOLDMAN & F. & G.

■ Avondale has alleged facts and circumstances that give rise to a claim of malpractice against F. & G. and Goldman. If Avondale is held liable to PFEL for

breach of contract, but a tort committed by F. & G. or Goldman, or both, caused that breach, then they would presumably be liable to Avondale in tort, as set forth in Part V, for the damages resulting from the breach, as they would for other legal consequences of their tort, see Prosser, Law of Torts, 4th Ed., § 129, at 941–942, even though they are not guilty of intentional interference with contractual relations.

Goldman contends that the record contains sufficient undisputed facts to establish that there is no tort claim against him, in the light of the doctrine of *Canter v. Koehring*, La.1973, 283 So.2d 716. Prior to *Canter*, an executive officer of a corporation was liable to a third person who suffered personal injury as the result of "misfeasance" that constituted a breach of a duty the officer owed to the corporation. *Delaney v. A. Rochereau & Co.*, 1882, 34 La.Ann. 1123; see also *Adams v. Fidelity and Casualty Co. of New York*, La.App. 1958, 107 So.2d 496, which extended the executive officer's tort duty to an employee whose sole remedy against the employer corporation was in workmen's compensation. *Canter* restricts this liability to circumstances where the corporation owes a duty of care to the third person, this duty is delegated to the defendant, and the defendant breaches this duty through personal fault. The officer "must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages." *Canter, supra*, at 721. See also, *Downey v. Callery*, La.App.1976, 338 So.2d 937. Goldman contends that, regardless of any obligation that F. & G. may have owed to Avondale, he had no personal obligation within the terms of *Canter* and *Downey*.

However, *Canter* and *Downey* are primarily concerned with the problem of the personal duty, if any, of corporate officers to provide corporate employees with a safe place to work. That is not the issue here. Additionally, *Canter* and *Downey* did not

involve a corporation engaged in furnishing professional services through the employment of professionals whose fault furnishes the gravamen for the complaint against the employer, as the present case does. The fact that a professional is employed by a corporation ought not protect him from liability for breach of his professional duties.

While Goldman was an executive officer, it is his personal fault in discharging his own professional duties that is charged as a tort. The situation is not greatly dissimilar in principle from the routine case of an employee who, while driving a vehicle in the course and scope of his employment, injures a third person. The employee is, of course, liable in solido with his employer. Goldman is not sued here merely because he was an executive officer of F. & G. It is alleged that he himself committed negligent acts. The claim against him could have been made with equal force had he been merely a designer, owned not a share in F. & G., and held no office in the corporation.

In the area of professional conduct, if a doctor breached his duty to a patient, he would not be absolved merely because he had been employed by a professional service corporation to treat the patient. Nor should Jerome Goldman be absolved of his liability for his personal negligence (malpractice) simply because he was employed by F. & G. Hence, the motion for summary judgment by Jerome Goldman on the basis of *Canter* must be denied.

## VII.

### CONTRIBUTION AGAINST JEROME GOLDMAN & F. & G.

The doctrine of *Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp.*, 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, which declined to exact contribution among joint tortfeasors under maritime law, has been restricted to situations where a statute [10] precludes recovery against the party from whom contribution is sought.

---

10. In *Halcyon, supra*, this statute was the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, which prohibited a covered employee from suing his employer.

*Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc.,* 1974, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694; *Horton & Horton, Inc. v. T/S J. E. Dyer,* 5th Cir. 1970, 428 F.2d 1131, cert. denied, 1971, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441; *Watz v. Zapata Off-shore Co.,* 5th Cir. 1970, 431 F.2d 100, 120; *In re Seaboard Shipping Corp.,* 2d Cir. 1971, 449 F.2d 132. In *Cooper,* the Supreme Court held that contribution may be required in a maritime non-collision case where the stevedore who is sued for contribution is not the employer of the plaintiff longshoreman, but reaffirmed that, where the stevedore is the employer, "our decision in *Halcyon* is still good law on its facts." The court approved the rule applied in *Horton & Horton, Watz,* and *In re Seaboard* in those non-collision cases where a statute does not bar recovery. See *Landon v. Lief Hoegh & Co., Inc.,* 2d Cir. 1975, 521 F.2d 756, 761, note 4; see also G. Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 1957, 45 Calif.L.Rev. 304.

Contribution under *Cooper* "rests upon a finding of concurrent fault."[11] 94 S.Ct. at 2179. Goldman contends that customarily a relationship of concurrent fault arises out of a single or simultaneous act of negligence such as where two negligent drivers collide injuring a third person. He contends that both his work and F. & G.'s work were completed before Avondale's alleged negligence came into play. Alternatively, he argues that PFEL's action against Avondale is based on contract, whereas PFEL's action against F. & G. and Goldman is primarily one for malpractice, a tort. But, despite the existence of a contractual relation between Avondale and PFEL, Avondale may be liable for negligence in performing its contract. There is, of course, an issue of material fact as to whether the alleged negligence of both tortfeasors was temporally sequential.[12] But, if we assume, as we must on this motion, that both were negligent at different times, it is possible that, after trial, the court might conclude that their negligence did interact to produce a single result. There was no tort until that damage occurred. Whether this suffices for purposes of finding that they are joint tortfeasors,[13] or that they are

---

11. The Supreme Court, in *Cooper, supra,* 417 U.S., at 115, 94 S.Ct., at 2179, made clear that liability for unseaworthiness could not be a basis of "concurrent fault" where the party seeking contribution is liable for negligence. In a brief per curiam opinion in *Atlantic Coast Line R. Co. v. Erie Lackawanna R. Co.,* 1972, 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110, the court *denied* a contribution action against an employer entitled to the limitation-of-liability protection of the Harbor Worker's Act with regard to negligence actions. According to the court, in *Cooper, supra,* any liability that the employer in the *Atlantic* case might have been subject to for unseaworthiness "would have been a strict liability not based upon fault . . [hence the employer] was not a joint tortfeasor against whom contribution could be sought." *Id.*

12. Part of F. & G.'s alleged negligence occurred during the period when the technical service contract was in effect, and F. & G. was supervising Avondale's construction of the ship. Whether Jerome Goldman's negligence is limited to his role in designing the vessel, which occurred prior to its construction, is irrelevant for practical purposes because any contribution claim Avondale may have against him is barred by laches for reasons set forth subsequently in this opinion.

13. According to Prosser, *Law of Tort,* 4th Ed., at 291:

> The terms 'joint tort' and 'joint tortfeasors' have been surrounded by no little uncertainty and confusion. There have been various attempts to define them, and to propose tests of one kind or another as to when this may be found to exist. An examination of the multitude of cases in which they are found leads to the conclusion that they have meant different things to different courts, and often to the same court, and that . . . 'joint tort' can have significance only in so far as it may involve some definite legal result . .

Prosser warns that treating "defendants whose negligence has concurred to produce a single result" as "joint tortfeasors" is a product of "careless usage." Prosser, *supra,* at 298. Whether the court, in *Cooper, supra,* which used the phrases "joint tortfeasors" and "concurrent fault" interchangeably, intended to restrict the contribution claim to parties that engaged in concerted acts of negligence or intended to allow such an action amongst tortfeasors who had concurred in producing a single result is uncertain. Because the present parties may have acted in concert at least with respect to some of their alleged negligence, the issue need not be resolved at this time.

guilty of "concurrent fault" within the concept of *Cooper*, cannot be adequately resolved on the basis of present briefs.[14] Hence, the motion for summary judgment on this basis by Jerome Goldman and F. & G. must be denied.

## VIII.

### LACHES IN ASSERTING CLAIMS AGAINST JEROME GOLDMAN

Both third-party defendants contend, however, that the indemnity, independent tort, and contribution claims are all barred by laches. We discuss this defense as to Goldman first, and we start with the claims for contribution and indemnity.

### A.

■ The Fifth Circuit has indicated that, in most instances, summary judgment will not afford the court an adequate opportunity to assay the unique facts and circumstances of the case relative to the laches issue. *Watz, supra*, 431 F.2d 100, 112; *Kenney v. Trinidad Corp.*, 5th Cir. 1965, 349 F.2d 832. See also *Larios v. Victory Carriers, Inc.*, 2d Cir. 1963, 316 F.2d 63. However, because of the multitudinous issues in this litigation and the inordinately burdensome cost of discovery which threatens to supplant the merits as the ultimate determinant of which party prevails, this court offered to hold a special hearing on the laches issue. Instead, Goldman and Avondale have stipulated to submitting the question for a decision based on affidavits and

exhibits relating to the issues of excusability and prejudice. Although such a stipulation was not made with respect to F. & G., the court has heard extensive oral argument on the issue and has taken the question under submission. The court has reviewed volumes of such exhibits and a bevy of briefs, and believes it has a grasp of the history and circumstances of this litigation that would not be enhanced by an evidentiary hearing. Counsel's submissions are adequate for the determination of the issue.

■ Mere delay in asserting a maritime claim does not bar it unless the delay is unreasonable and the party against whom it is asserted is unduly prejudiced. *Watz v. Zapata Off-shore Co.*, 5th Cir. 1974, 500 F.2d 628. Where the delay is great and patently unreasonable, less prejudice may be required than where the delay is slight. *Fidelity & Casualty Co. of N. Y. v. C/B Mr. Kim*, 5th Cir. 1965, 345 F.2d 45, 50. But prejudice is not established merely because one loses what he otherwise would have kept; rather, the delay must subject him to a disadvantage in asserting or establishing his claimed right or defense. *Esso Intern., Inc. v. S. S. Captain John*, 5th Cir. 1971, 443 F.2d 1144; *Akers v. State Marine Lines, Inc.*, 5th Cir. 1965, 344 F.2d 217; *In re Casco Chemical Co.*, 5th Cir. 1964, 335 F.2d 645.

■ One factor to be considered in determining whether laches bars the action and in apportioning the burden of persua-

14. Counsel for F. & G. and Goldman contends that, in light of the uncharted course of maritime contribution jurisprudence, Louisiana law ought to govern by analogy, and that, under Louisiana law, a contribution action based on these facts would not succeed. LSA CC Art. 2091 provides: "There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor." LSA CC Art. 2092 provides: "The obligation may be in solido, although one of the debtors be obliged differently from the other to the payment of one and the same thing . . . .". Contribution will lie wherever such a solidary obligation exists. *Jobe v. Hodge*, 1969, 253 La. 483, 218

So.2d 566. Moreover, solidary obligors are liable for contribution regardless of whether their obligations arise ex contractu or ex delicto. *Swanson v. Comeaux*, La.App.1973, 286 So.2d 117, aff'd, La.1974, 296 So.2d 267. Hence, it appears that even if Avondale were liable only in contract and F. & G. or Goldman only in tort, both are nonetheless liable for the "same thing"—the costs incurred due to defects in the ship—and subject to contribution. Payment by either would excuse the other. Thus, the Louisiana jurisprudence, even if applied in a maritime case, would not be helpful to the contribution defendants. But *cf. Phillips v. Houston Fire & Casualty Co.*, W.D.La.1963, 219 F.Supp. 420; *Wooten v. Wimberly*, La.1973, 272 So.2d 303; *D'Albora v. Tulane University*, La.App. 1973, 274 So.2d 825.

sion is whether the analogous state statute of limitation (denoted as a prescriptive period under Louisiana law) has expired. When a plaintiff who asserts a maritime claim after the state statute has run presents evidence tending to excuse his delay, the court must weigh the legitimacy of his excuse, the inference to be drawn from the expiration of the state statute, and the length of the delay, along with the evidence of prejudice, if the defendant comes forth with any. Although the plaintiff has the ultimate burden of persuasion in such circumstances, both as to the excuse for his own delay and as to the lack of prejudice to the defendant, these two factors are not to be viewed independently. *Larios v. Victory Carriers*, 2d Cir. 1963, 316 F.2d 63, 66–67; *Fidelity & Casualty Co. v. C/B Mr. Kim*, 5th Cir. 1965, 345 F.2d 45, 50.

Whether the state statute has run depends in part on when it is deemed to start. When prescription commences in maritime contribution actions is an issue never precisely decided; it was specifically reserved by the Fifth Circuit in *Watz, supra*, 500 F.2d, at 634. The court noted "persuasive cases can be made for imposing on a knowledgeable defendant an early duty to alert a potential collateral tortfeasor [citations omitted], even though that defendant's right or claim does not technically arise until he pays a judgment or is at least held liable in his own account." *Id.* Nor is Louisiana law settled on the question of when prescription on a contribution action commences. Compare *Halliburton Co. v. Norton Drilling Co.*, 5th Cir. 1963, 313 F.2d 380, 381 (when the tortfeasor is cast), and *Brenham v. Southern Pac. Co.*, W.D.La. 1971, 328 F.Supp. 119, 124 (upon payment of

debt), with *Lanier v. T. L. James & Co.*, La.App.1962, 148 So.2d 100, 104 (date of judicial demand), and *Brown v. New Amsterdam Casualty Co.*, 1962, 243 La. 271, 142 So.2d 796, 798 (date of judicial demand for purposes of determining retroactivity of amendment).[15]

■ There are similar problems in maritime law with respect to whether laches can commence to run on a claim for indemnity before the amount for which indemnification is sought has been paid. It is generally observed that an action for indemnity does not "accrue" until the primary liability has been determined. See *States Steamship Co. v. American Smelting & Refining Co.*, 9 Cir. 1964, 339 F.2d 66, 70; *Francosteel Corp. v. S. S. Tien Cheung*, S.D.N.Y.1973, 375 F.Supp. 794. But the cause of action does, in fact, accrue before then; if it did not, Avondale could not even assert it in this action. Third party practice under Rule 14, Federal Rules of Civil Procedure, permits the joinder of any party who "is or may be liable" to the defendant for any of the demands made in the complaint. Whether or not the defendant will be liable to the plaintiff, and, if so, in what amount, will, of course, not be known until the main action is over. But it does not follow that the claim for contribution or indemnity does not arise until then.

If a prescriptive period is applicable, then apart from the starting date, it is necessary to determine the duration of the prescriptive period. That creates another quandary, for whether the right to contribution between joint tortfeasors is governed by the one-year period applicable to actions in tort ("offenses or quasi offenses") under

---

**15.** *Brown* and *Lanier* merely held the date of judicial demand is controlling for purposes of determining what actions are governed by the 1960 amendment to Article 2103 of the LSA-Civil Code and did not hold that prescription commenced on that date. However, the courts did find that the 1960 amendment overruled *Kahn v. Urania Lumber Co.*, La.App.1958, 103 So.2d 476, which required that a joint tortfeasor be condemned in judgment before his contribution action arose. Under the amendment, contribution could be demanded between joint tortfeasors regardless of whether a joint

judgment has been obtained against them. See *Illinois Central Railroad Co. v. Braswell Ind., Inc.*, W.D.La.1964, 227 F.Supp. 347, 354. According to the court in *Lanier*, "the rights of joint tort feasors as between themselves (contribution) arise from judicial demand . .". Because prescription commences when a plaintiff has a right to enforce his claim, *Dore v. Kleppe*, 5th Cir. 1975, 522 F.2d 1369; *Wilkinson v. Wilkinson*, La.1975, 323 So.2d 120, presumably prescription would commence on the date of judicial demand.

LSA CC Art. 3536, or the ten year period applicable to actions for indemnity under LSA CC Art. 3544, has never been resolved. See *Brenham v. Southern Pac. Co., supra.*

■ For present purposes, we assume resolution of the prescriptive issues adversely to Goldman, that is, we assume that the Louisiana prescriptive period would not have run against assertion of the contribution and indemnity claims either because it has not commenced, or, if it has, that it has not elapsed. We turn nonetheless to the questions of excusability of delay and negligence, for laches may bar a cause of action even where the appropriate limitation statute would not. See Moore's Federal Practice ¶ 3.07[3], at 755, note 18, and cases cited therein.

■ In this respect, we face the issue for which no authoritative ruling has been cited by counsel: Assuming both delay and prejudice, may laches bar the right to contribution and indemnity before the liability for the primary debt has been determined? To answer this question with a categorical negative would be to permit manifest injustice. Even with this court pressing the litigants to discovery and to trial, some three and one-half years will have elapsed between the time suit was filed and the day the case reaches trial, and it is likely, even if the Speedy Trial Act or other unforeseeable events do not cause a further delay, to be at least two years thereafter before a judgment becomes final after appeal. That will be nearly six years from the date of suit, and thirteen years from the time the vessel was designed. The doctrine that the secondary claim need never be asserted until the liability on the primary claim is determinate would mean a resumption of inquiries into the facts when they are approaching an age for historical, rather than judicial, inquiry. Hence, while in the usual

case the delay in waiting until the primary claim is resolved would not be unreasonable, in this instance it would be. Whether a statute of limitations would run is another inquiry; the doctrine of laches is not statutory but equitable. Under some circumstances, it may be unreasonable for one who claims contribution or indemnity to wait until liability is fixed before asserting his third-party claim. Hence, laches may indeed run before liability is conclusively determined.

Avondale was aware of serious design deficiencies as early as December, 1968.[16] Despite the dispute concerning when it knew the nature and cause of these defects, and the various facts that may have put it on notice of its claims earlier, the August 21, 1972, Prudential Grace letter previously referred to in this opinion put it on full notice. Nonetheless, Avondale did not file suit against PFEL until January, 1974, and did not assert a tort claim against or seek indemnity or contribution from Goldman until June 1976. With respect to other claims, involving different parties to this litigation, it has been contended that claimants were lulled into inaction by Avondale's and DeLaval's repair efforts and representations that the defects could be corrected. See *Bewley Furniture Co. v. Maryland Casualty Co.,* La.App.1972, 271 So.2d 346, 352. But Avondale has never contended that Goldman made such representations or misled it in any way into thinking he was assuming any personal responsibility for correcting any change. Moreover, it was apparent from the August 1972 letter that the defect was at least claimed to be organic and that it was then claimed, at least by Prudential Grace, that "every corrective step, every experiment and all the tinkering" had failed to solve it.

16. A letter from Avondale to F. & G. dated December 17, 1968 (Exhibit 3 to Exhibit Volume of F. & G.'s March 4, 1977, memorandum), states: "We have been faced with a considerable number of design deficiencies in the contract drawings and specifications that have seriously affected the orderly development of engineering and working plans for the subject vessels." The remainder of the letter details the alleged deficiencies with great specificity. See also Avondale's internal memoranda of August 15, 1968, May 27, 1969, and August 8, 1969, and its letters of June 3, 1968 and June 12, 1969 (Exhibits 20 through 24 to Avondale's Opposition Memorandum filed December 3, 1976, Volume IV).

Where judgment or settlement will follow the alleged wrong with reasonable speed, it may be reasonable to delay making a claim for contribution or indemnity until the nature and amount of the claim are certain. Here, however, a number of years had already elapsed before the nature of the harm was discovered, and more years of delay ensued in litigation. Throughout this time the identity and role of Goldman was known. Avondale has offered neither reasonable explanation nor excuse for its failure to cite Goldman until 1976.

Upon being sued, Goldman retained the same counsel who was already representing F. & G. The two clients' interests appeared to be identical and Goldman was a controlling stockholder in F. & G. By employing F. & G.'s lawyer, he gained the advantage of the knowledge and preparation that counsel's prior involvement in the case provided. But, Goldman, as an individual, was nonetheless substantially prejudiced in his ability to prepare his defense. In July, 1974, after F. & G. had been sued by PFEL, but two years prior to the time either it or Goldman was sued by Avondale, the court held a conference with all counsel. It ordered depositions to commence in February, 1975, at a grueling pace, involving a minimum of ten full calendar days in each month thereafter. Counsel for F. & G. stated that their client could not afford such a time-consuming schedule and would put on a limited defense, attending depositions on a selective basis. Their counsel did not attend much of the document discovery of opposing parties. Of the thirty-three full days of depositions of DeLaval witnesses and approximately forty-one full days of depositions of PFEL witnesses, all but four days occurred prior to the filing of Avondale's motion to permit the filing of a third-party complaint against Goldman. Avondale's counsel had actual knowledge prior to the taking of any depositions that counsel for F. & G. did not plan to attend the bulk of the depositions.[17] F. & G.'s counsel's participation has been limited and their attendance at depositions perforce sporadic. Not only would their participation have been greater had Goldman been a party, but the focus of counsel's questions and the nature of their discovery efforts would have been different.

The court can, of course, allow counsel now to engage in the document and deposition discovery that it was not privy to. But memories will have grown more hazy, and difficulties in locating witnesses and records may develop. Many of these problems cannot be predicted with specificity, but they are the usual consequences of several years of delay in discovery of this magnitude. Nor does Goldman's personal knowledge of the design of the vessel compensate for his disadvantage in locating evidence and witnesses for trial purposes nor for his inability to challenge a number of witnesses at the time of their original deposition. In addition, if past discovery is reopened for the purpose of enabling Goldman as an individual to participate in the matters that concern them, the trial date, now set for three and one-half years *after* this suit was filed, would once more be postponed.

The delay was inexcusable and unreasonable. The prejudice to Goldman's ability to prepare his personal defense was substantial. Hence, the claim against him for contribution and the claim for indemnity based on the premise that he was an active tortfeasor and Avondale may be liable without fault must be barred for laches.

LSA CC Art. 3536 sets a prescriptive period of one year for offenses and quasi-offenses. The prescription commences when an individual has sufficient notice of the nature of the harm to prompt a reasonably prudent person to make further inquiries. *Nivens v. Signal Oil & Gas Co., Inc.*, 5th Cir. 1975, 520 F.2d 1019; *Dean v. Hercules, Inc.*, La.1976, 328 So.2d 69; *Cartwright v. Chrysler Corp.*, 1970, 255 La. 598, 232 So.2d 285; *Northwest Insurance Co. v. Pulmosan Safety Equipment Corp.*, La.App.

17. See the letter attached to Affidavit of Moise S. Steeg, Jr., Exhibit 4 to Memo on Laches filed March 4, 1977 (Volume XIII). Although F. & G. sent a corporate officer to the DeLaval depositions in Philadelphia in April, 1975, it was not represented by counsel.

1975, 321 So.2d 791; *LeMoine v. Avoyelles Farmers Co-op,* La.App.1975, 307 So.2d 762. Accordingly, prescription on Avondale's tort claim against F. & G. for defects in the design of the new reduction gear system commenced to run no later than August 21, 1972, when Avondale received the Prudential Grace letter.

Although the nature of the tort may have been belatedly discovered, the alleged tort itself consists of specific acts of negligent design, and does not constitute a continuing tort which would be subject to suit within one year of the last date of damage. See *Nivens v. Signal Oil & Gas Co., Inc., supra; Patin v. Stockstill,* La.App.1975, 315 So.2d 868; *Perkins v. Simon,* La.App.1972, 265 So.2d 804; *Pachi v. Kammer,* La.App.1961, 130 So.2d 417; Note, 1964, 38 Tul.L.Rev. 769, 770. Accordingly, the state statute of limitation for an independent tort expired in November, 1973, some two and one-half years prior to the time that Avondale sued Jerome Goldman. No justification for this delay has been offered or adduced, and the resulting prejudice has been adequately detailed. Not only is the prejudice to Goldman as substantial with respect to any independent delictual claim as it is with respect to the claims for contribution and indemnity, but the expiration of the applicable state statute of limitation provides an additional indicium of the unreasonableness of the delay. Accordingly, Jerome Goldman is entitled to summary judgment against Avondale's tort claims.

## IX.

## LACHES IN ASSERTING CLAIMS AGAINST F. & G.

 Because F. & G. was sued by PFEL in April, 1974, it was capable of participating in most of the discovery and of preparing a defense against PFEL's claims. Because the central issue in a contribution action by Avondale against F. & G. would be whether F. & G. is liable to PFEL jointly with Avondale, F. & G.'s preparation for PFEL's claims materially assisted in its preparation for Avondale's limited contribution claim. To the extent Avondale seeks indemnity from F. & G., the same inadvertent preparation occurred. The questions F. & G. would have asked of witnesses, and the documents it needed should not have been materially different had it known that Avondale would later sue it for contribution or indemnity. F. & G. was able to depose witnesses and gather documents as early as 1974, while Goldman was first brought into the case in 1976. Although Avondale's delay in asserting its contribution action against F. & G. may have been as unreasonable as its delay with regard to Goldman, the prejudice to F. & G., unlike that suffered by Goldman, is not sufficient to justify barring Avondale's contribution or indemnity claim for laches.

Both the unreasonableness of the delay and the prejudice suffered by F. & G. is greater with respect to Avondale's independent tort claim than with respect to Avondale's contribution and indemnity claims. For reasons noted, F. & G.'s preparation for PFEL's tort claim, commencing in 1974, inadvertently helped to prepare it for Avondale's contribution and indemnity claims, because its liability to PFEL is a central concern in that claim. However, it did not help to prepare F. & G. to defend Avondale's tort claim to the same extent, for the issues in that action may differ materially. Hence, F. & G. suffered prejudice from delay with respect to the tort claim that it did not suffer with respect to the contribution claim.

For reasons noted, the state prescriptive period for tort claims expired approximately two and one-half years prior to Avondale's tort claim against F. & G. However, it is not certain whether the state prescriptive period for contribution and indemnity actions expired prior to Avondale's asserting these claims. Hence, an inference that the delay was unreasonable may be drawn with respect to the tort claim, while that cannot be done with respect to the contribution claim. No explanation whatsoever is offered for Avondale's delay in filing its tort claim. Accordingly, the delay with respect to the tort claim is patently less excusable and more unreasonable.

These differences in circumstance justify a difference in result. The prejudice to F. & G. in preparing its defense to Avondale's tort claim is substantial. Discovery has been occurring for several years and, although F. & G. was privy to the suit during a substantial part of this time, it was not on notice of Avondale's tort claim, hence was unable adequately to focus discovery efforts to defend against it. This delay of perhaps seven years from the time the defects were first apparent, of three and one-half years from the time the nature and cause of the defects were known, and of two and one-half years after the expiration of the applicable state prescriptive period, was unreasonable and inexcusable. Accordingly, Avondale's tort claim against F. & G. must be barred for laches.

## X.

The documents and briefs filed have been, as Avondale correctly characterizes them, "voluminous." It may be that Avondale asserts other claims against Goldman and F. & G. than those relating to the propulsion system. For example, on May 30, Marad rendered a decision with respect to additional bottom structure, holding some extra costs to be PFEL's responsibility rather than Avondale's. This opinion does not reach any claims other than those relating to the design of the propulsion system, its foundation and components.

But with respect to the issues decided in this opinion, they can and should be ruled on now. It is clear from the number of issues dealt with and their intricacy that the case is complex, the trial will be lengthy and the other issues difficult. If, by the summary judgment procedure, the issues at the trial can be reduced, the court should make every effort to accomplish this.

PFEL has never asserted a claim against its architect, F. & G. While the contribution claim by Avondale against F. & G. remains to be tried, the principal issues at the trial are between PFEL, DeLaval and Avondale.

## XI.

Jerome Goldman's motion for summary judgment against Avondale's claims in tort, contribution, contractual indemnity and tort indemnity is GRANTED. As no other claims have been asserted against Jerome Goldman, the court of its own motion DISMISSES that defendant from the case. F. & G.'s motion for summary judgment against Avondale's claim in tort, contractual indemnity and tort indemnity is GRANTED. F. & G.'s motion for summary judgment against Avondale's contribution claim is DENIED.