338 So.2d 937 (1976)
Terrance E. DOWNEY
v.
Thomas R. CALLERY et al.
No. 7565.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 1976.
Rehearing Denied November 12, 1976.
Writs Refused January 14, 1977.
*938 Mollere, Flanagan & Arceneaux, James S. Arceneaux, Metairie, for defendants-third-party petitioners-appellants and appellees.
Connolly, LaBranche & Lagarde, Frans J. Labranche, Jr., New Orleans, for plaintiff-appellee-appellant.
*939 Porteous, Toledano, Hainkel & Johnson, William A. Porteous, III, New Orleans, for defendant-appellee Norwich Pharmaceutical Corp.
Montgomery, Barnett, Brown & Read, Wood Brown, III, New Orleans, for defendants-third-party plaintiffs-appellants Stokes Equipment, Div. of Pennwalt Corp.
Before SAMUEL, REDMANN and SCHOTT, JJ.
SCHOTT, Judge.
This case arose out of an industrial accident in which plaintiff suffered severe burns while in the course and scope of his employment by Century Laboratories, Inc. at its plant in Metairie, Louisiana. Made defendants were the nine members of Century's Board of Directors, including Thomas R. Callery, who was also the president of the corporation; the Employers Liability Assurance Corporation, as insurer of the directors and officers of Century; Pennwalt Corporation and Norwich Pharmaceutical Corporation. From a judgment in favor of plaintiff against six of the directors, including Callery, and Employers for $75,000, the defendants have appealed. Plaintiff has also appealed seeking an increase in the amount of the award and a reversal of the trial court's dismissal of his claim against Pennwalt and Norwich.
In 1967 Norwich, a large pharmaceutical company, engaged Century to participate in the manufacture and packaging of sodium furadantin (Na Fd) [1], a drug used in the treatment of urinary tract infections. Norwich held the patent on this drug and supplied to Century the raw material, crude or technical Na Fd, to be converted into sterile Na Fd and packaged in vials for ultimate use in medical treatment. Norwich provided Century with a detailed procedure for processing and packaging the substance.
Early in 1969 plaintiff was employed by Century to participate in the final stage of the process. He was to accept from another department cakes of the nearly finished substance, place them in an oven so as to reduce the content of moisture, methanol, and volatiles to an acceptable maximum percentage, then place the cakes in an electrically driven oscillator so that the substance would be ground into a fine powder, and then pack the powder in sterile bags to be placed thereafter in the vials.
On Friday, February 13, 1970, near the end of a work day he was prepared to remove one of these cakes from the oven for granulation but upon analysis by a Century chemist plaintiff was informed that the cake had not reached an acceptable point to permit granulation, so that the cake was left in the oven overnight for the baking process to be completed. On the following morning, plaintiff removed the cake from the oven and deposited it into the granulator. This machine was to operate with the cover closed on the hopper. Plaintiff noticed the material was not passing through the granulator so with the machine running he opened the hopper and with a metal spatula began to push the material down into the blades. The spatula struck the blades, whereupon an explosion and flash fire occurred causing the injuries to plaintiff.
Plaintiff alleges that Callery and the other directors were negligent because they failed to warn him of the explosiveness and inflammability of Na Fd and to supply him with static electricity free and non-inflammable clothing; supplied him with a metal spatula as opposed to another kind which would not generate sparks on contact with the parts of the stainless steel oscillator; maintained on the machine an electric motor which was no explosion proof and was not properly grounded; had two ovens in the room, both with open flame pilot lights, as well as an air conditioning unit with the potential for ignition; and permitted him to work under these conditions in an atmosphere where the dust of a highly explosive and inflammable material was present.
*940 Plaintiff also alleges those defendants failed to provide emergency showers, sprinklers or fire blankets, and generally ignored the necessity for a safety program which would have warned plaintiff and prevented the accident. He further alleges Norwich failed to warn him of the danger of furadantin and to train him properly so as to process the substance in safety. Finally, plaintiff's claim against Pennwalt is based upon the existence of defects in the machine itself which Pennwalt manufactured.
The trial judge found plaintiff's working conditions were unsafe and he was not properly instructed with regard to the handling of Na Fd. He found that the granulator was hazardous under the circumstances and that safety was not given serious consideration by Century's directors, noting that there had been two prior explosions at Bristol Laboratories which had processed Na Fd before Century was employed to do it for Norwich. Plaintiff was not advised of this although, the trial judge found "this fact was known to Century's directors." In exonerating Norwich the trial court found that it had warned Century of the substance's dangerous characteristics but that Century's directors failed to pass this on to plaintiff. As to Pennwalt, the court found that the machine was twelve years old and had been refurbished by Century so that the liability was confined to Century's directors because the machine and plaintiff's overall working conditions were unsafe. In order to review these findings, it is necessary at the outset to establish the identity and role of the individuals who were made parties to the suit and the others who had some connection with the Na Fd project from the time Century started it until the accident happened.
As has been said, cast in judgment were six Century directors among the nine who were sued. Included among the six were Callery and Walter M. Rovenski, whose part in the scenario will be discussed hereafter. The remaining four directors had nothing directly to do with the Na Fd aspect of Century's business, which formed only fifteen percent of the total business. These four directors usually attended monthly board meetings and two of them served on a steering committee which was primarily concerned with hiring suitable management. Only one of these four testified at the trial. He professed ignorance about the characteristics of Na Fd and the technical processing thereof. He testified that safety procedures and policies were left to management. We are satisfied these four defendants were typical non-management directors who were, first, investors, and were, secondly, interested in the overall policies and control of the company, but who left the management of day-to-day operations to the president and the other management personnel.
In 1967 Rovenski was serving Century's predecessor corporation in the capacity of a marketing representative. He had become familiar with Na Fd while employed by Philadelphia Laboratories, a company which had hoped to process Na Fd for Norwich. He initiated contact with Norwich on Century's behalf, and after getting Norwich to survey Century's physical plant and facilities procured the employment of Century. He became a director of Century in 1968, but had nothing to do with production or manufacturing procedures. His office remained in New Jersey where he continued to function as the marketing representative. He knew that Na Fd was hazardous, having been told that it was explosive, and he passed this information on to the then president of Century, Paul H. Bowdle, who resigned on July 13, 1969. Except for his attendance at board meetings on a monthly basis, Rovenski came to the plant in Metairie no more than four days a month. He had never heard safety discussed at board meetings but he relied on production and quality control supervisory personnel to look after safety procedures.
When Na Fd was initially processed at the Century plant, Leslie Boros was the technician employed by Century to perform under the supervision of Louis A. Wilson the duties later undertaken by plaintiff. He testified that he was well aware of the dangers involved in Na Fd with respect to *941 inflammability and combustibility. This information had been conveyed to him by Russell Mosher and Richard Donchak, both Norwich employees who worked with Boros at the Century plant when the project was getting under way at Century. Furthermore, he had been warned by personnel of Bristol Laboratories, which had previously processed Na Fd, that all operations would have to be performed with extreme care. Finally, he had been told about two incidents of explosions from Na Fd at Bristol. In one a technician had placed a hot spatula into a batch of Na Fd precipitating an explosion and fire. Boros testified that he would never have opened the hopper while the motor was running because of the considerable amount of dust which would come out of the grinder and that he would not stick the spatula into the hopper because of the risk of a spark causing an explosion and flash fire. He would not have granulated the product in the same room with an oven containing a pilot light. He made a verbal report to Bowdle about the flammability of the product. He testified that he had discussed the explosive qualities of the substance with Mosher and that Mosher was well aware of its explosive qualities.
On the other hand, Mosher testified that he did not feel the substance was explosive although he had heard about the Bristol incidents and cautioned Century's personnel that there was a possibility that it was explosive. He was aware that the material was inflammable and did convey this information to Boros, Bowdle and Wilson. Because the substance was inflammable he had recommended against the use of an electric granulator and he told Century's personnel that the motor should be at least explosion proof if the electric granulator was used. He did not suspect that there was any danger in the use of a stainless steel spatula as opposed to some other type.
Donchak, another Norwich employee, who had been in charge of quality control in the early stages, gave testimony similar to Mosher's in that he maintained he was not aware of the explosive quality of the substance although he was aware of its inflammability. His testimony was inconsistent with his admission that he knew about the incident at Bristol and with his testimony that he told plaintiff about this incident.
When plaintiff first worked at Century he was placed under the direct supervision of L. J. Novak with respect to processing of the substance and J. Huston with respect to quality control. The superintendent continued to be Louis Wilson. According to plaintiff, he was given no information regarding the explosive or highly combustible quality of Na Fd before the accident. Neither Novak nor Huston was produced as a witness but a letter that was written by Novak in February, 1969, to Bowdle with copies sent to Huston and Wilson was introduced by plaintiff. It contained the following:
"Information on Furadantin Process Resulting from Conferences between Mr. Russell Mosher (Norwich Pharmacal) and Messrs. Huston, Novak and Wilson of Century Laboratories During Period from 2/23/69 to 2/26/69.
* * * * * *
"9. Avoid static electricity, sparks, flames, etc. with dried Na furadantin. It is highly combustible in open containers and explosive in closed containers with excess air or oxygen."
Plaintiff attaches great significance to this letter, contending that it establishes negligence on the part of the directors for failing to warn him about the product, since that letter was written long before his accident and was in the company files while he was employed but was never brought to his attention. The record contains no explanation why Novak, who wrote the letter, never conveyed a similar warning to plaintiff with whom Novak worked side by side while training plaintiff to process the substance. We are also left to speculate as to why Huston did not bring the letter or its message to plaintiff's attention. Since they were plaintiff's supervisors it would appear that they had a clear duty to plaintiff in this connection.
As to Wilson, he admitted that he participated in the discussions with Novak, Huston and Mosher, referred to in the letter, *942 and yet he testified that he did not know Na Fd was explosive and did not recall combustibility of the material being discussed. When cross examined on the point, he said that he had not seen the letter before February, 1973, and then qualified his testimony by the explanation that he did not regard it as important and had forgotten about it. He admitted having set up the system for producing Na Fd at the outset but said when plaintiff was employed he worked directly under Novak and Huston, who both reported directly to the president, Callery. He disclaimed responsibility for the safety of plaintiff, maintaining that this was the responsibility of Callery and the two supervisors.
Plaintiff also testified that he was not told about the incident at Bristol Laboratories, contradicting Donchak's testimony, which was, however, itself inconsistent. Plaintiff's testimony on this subject was also contradicted by Leonard Levy, another Norwich employee, who helped train plaintiff and who testified that he had told plaintiff the substance was combustible.
Callery succeeded Bowdle to the presidency in July, 1969. He had been involved in contract marketing and had little experience in production. He knew nothing about the production of Na Fd. He took the position that the supervisors were responsible for safety. He did not know Na Fd was combustible and had gotten no complaints about safety procedures. There was no overall safety program because of the small size of the company and because each supervisor was expected to handle safety in his department. He had never seen the Novak letter and was unaware of the incident at the Bristol Laboratories. Dr. Novak reported directly to him and he never discussed the hazards of Na Fd. At the time of the accident the sales to Norwich accounted for only one-seventh of the company's total sales.
Finally, Margarette Burchett, employee of Century in quality control, testified that she was the one to test samples of the cakes of Na Fd to determine moisture, methanol and volatile content. While the procedure required that she issue a pink release slip to plaintiff before the material could be granulated, in this case she told plaintiff on the Friday before the accident that the material should remain in the oven for several more hours after which it would be in order for him to granulate the material. The most significant part of her testimony, however, was that after plaintiff's accident she conducted an experiment in which she vacuum dried some of the Na Fd, and after it had cooled down the material crept up the sides of the vial. She touched the side of the container with a teflon stirring rod and it exploded.
From the foregoing testimony the following facts emerged: Na Fd was inflammable and combustible, and when ground to a fine powder almost devoid of moisture it would be likely to explode with a flash fire if exposed to any point of ignition. When plaintiff opened the hopper while the granulator was in operation much of the substance in the form of dust flew out of the granulator and permeated the atmosphere of the room. The explosion was caused by a spark from contact between the stainless steel spatula and the stainless steel parts of the oscillator which were in motion.
From these findings it follows that the portion of the trial court's judgment dismissing plaintiff's claim against Pennwalt must be affirmed. The evidence does not support plaintiff's theory that the accident was caused by a defect in the granulator dating back to its manufacture by Pennwalt.
The trial judge apparently accepted the testimony of plaintiff, that he was never told about the explosiveness of the substance although this seems almost inconceivable in view of the fact that he was working alongside of Novak for a considerable period of time. Nevertheless, we do not substitute our judgment for the trial judge's in a case of credibility call. Consequently, we find that there was a failure on the part of someone to warn plaintiff about the danger of the substance which failure caused his injury.
*943 The trial judge exonerated Norwich and we find no error in this conclusion. Boros was an employee of Century before plaintiff became employed and he was well aware of the danger of the substance. Novak, plaintiff's superior in the chain of Century's command, was well aware of the danger as demonstrated by the letter he wrote to the previous president, Bowdle. There is no support for the theory that Norwich failed to warn because Century, through these particular employees, had knowledge of the hazard.
The crucial question becomes whether the members of the board of directors, including president Callery, were legally liable to plaintiff because they failed to warn plaintiff of the hazard.
Canter v. Koehring Company, 283 So.2d 716 (La.1973) is a leading case on the problem of executive officer liability. There the Supreme Court said that the corporate officer is individually liable to a third person damaged solely by reason of the individual breach of the employment-imposed duty under these circumstances:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
"2. This duty is delegated by the principal or employer to the defendant.
"3. The defendant officer, agent, or employee has breached this duty through personal (as contracted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which as resulted from the breach of the duty.
"4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm."
When these criteria are applied to Century's directors we must conclude that there is no liability. There is no question but that Century Laboratories owed a duty of care to its employees with respect to general safety conditions in the plant. As to all of these directors, other than Callery, neither the evidence nor common sense would dictate that Century Laboratories delegated this duty to individuals who had only an investment oriented, occasional connection with the company. Plaintiff has cited no authority which would make such occasionally connected directors responsible for injuries to employees which can be attributed to inferior safety standards in the operation of the company's business.
On the other hand, it can be said that Century, like any corporation, did delegate the duty of providing safe working conditions to employees to its president, Callery. However, it must be shown that Callery has breached this duty through personal fault and not merely through technical or vicarious fault, and with regard to personal fault, personal liability cannot be imposed upon Callery simply because he was president; he must have a personal duty toward plaintiff which specifically caused plaintiff's injury. Callery testified that he was unaware of the danger of Na Fd and had never seen the Novak letter. Apparently, plaintiff would contend that he *944 breached a personal duty to plaintiff because he failed to find out about Na Fd's propensities or that he failed to read all of the letters in the files of Century with respect to sodium furadantin. Even assuming that this has merit, the Canter case obliges us to hold that where Callery delegated with due care to responsible subordinates his general responsibility to plaintiff Callery was not himself personally at fault and liable for the negligent performance of that responsibility unless he should have known of its nonperformance and nevertheless failed to cure the risk of harm.
The evidence shows that the very person who wrote the letter to Callery's predecessor on which plaintiff relies most heavily was a direct supervisor of the plaintiff. The only knowledge Callery could have about the hazard would come from the letter which Novak wrote and it would not seem reasonable to fault Callery for failing to learn the contents of Novak's letter so as to inform plaintiff of those contents, when Novak himself was instructing plaintiff in the first instance.
It must be remembered that Callery was the president with overall administrative responsibility for a company doing a business of which Na Fd processing was only about 15%. This was a relatively small company and there was no individual charged with the overall safety of the plant. It was reasonable for Callery to delegate safety to the individual supervisors who, in this case, were Wilson, Novak and Huston. Wilson and Huston were sent copies of Novak's letter and were well aware, or should have been aware, of the hazard to which plaintiff was exposed. The rule of Canter v. Koehring imposes liability or responsibility on either or all of these three employees, yet none were defendants in this case.
Accordingly, that part of the judgment in favor of plaintiff against defendants Rovenski, Clancey, Buckley, Callery, Herpich, Garrett and Employers Liability Assurance Corporation, Ltd. is reversed and there is judgment in favor of these defendants, dismissing plaintiff's suit at his cost.
That portion of the judgment which dismisses plaintiff's claim against Pennwalt and Norwich, and dismissing the third-party demand of Rovenski, et al. are affirmed.
REVERSED IN PART.
AFFIRMED IN PART.

ON APPLICATION FOR REHEARING
PER CURIAM.
In his application for rehearing plaintiff takes the position that we have substituted our judgment for that of the trial court in finding of fact beyond that acceptable limits of appellate review as set out in Canter v. Koehring, 283 So.2d 716 (La.1973). He points to the trial judge's findings that the defendant directors were aware of two prior explosions of Na Fd at Bristol Laboratories as compared to our findings that Callery, the president and a director of Century, was unaware of these incidents.
The record is devoid of any evidence to show knowledge on Callery's part of the Bristol incident or the propensities of Na Fd. His testimony which is unrefuted was that he worked for Bristol in the administrative and marketing area at its New York office while the laboratory was located in Syracuse. As to the Novak letter, plaintiff denied having seen the letter, and there is no evidence to refuse this testimony. In any event, we held in our original opinion, and reiterate here, that actual knowledge is not the issue. Callery is absolved from liability under the authority of the Canter case because the record shows that there was a delegation of his general responsibility for safety in the use of Na Fd to responsible subordinates, particularly Dr. Novak who, by plaintiff's own admission, was his supervisor and by Callery's uncontradicted testimony was the person in charge of safety in the Na Fd operation. In addition to what we said in our original opinion, it should be mentioned that Dr. Novak was a technical person with a Ph.D. This delegation by Callery meets the criterion established in the Canter case. It relieves Callery of liability because there was a delegation with due care to some responsible subordinate.
*945 It becomes obvious that the basis for our holding is not at all a finding of facts inconsistent with that of the trial judge because he did not reach that fact question at all. He made no finding as to whether or not Callery delegated his general responsibility for safety in the handling of Na Fd to a subordinate and whether or not that subordinate was "responsible." We made affirmative findings on these factual issues and, further, that Callery was entitled to rely on Novak and was no liable on the theory that he should have known of Novak's "non-performance or mal-performance" of his delegated duty.
In his application for rehearing plaintiff says the following:
"On Page 10 of this Court's Judgment the conclusions as to how the accident occurred are not substantiated by any facts in the record.
1. Plaintiff did not open the hopper while the granulator was in operation.
2. Dust did not fly out and permeate the atmosphere.
3. The explosion was not caused by the stainless steel spatula striking the stainless steel oscillator."
On point 1, we acknowledge that our statement was not technically accurate. Plaintiff testified that he turned off the granulator, opened the hopper, and then started the granulator again while he stuck the spatula down toward the blades. In any event, the granulator was operating with the hopper open, so that our original statement is essentially correct.
On point 2, this would seem to be the logical result of a dry substance being ground into a fine powder in an open container and would require no evidence to support it. In any event, Leslie Boros, who was plaintiff's predecessor in his job, testified that the grinding operation created dust inside the hopper and he would wait a few minutes after grinding before opening the hopper to prevent the dust from coming out.
On point 3, our review of plaintiff's own testimony along with that of Margaret Burchett, who was plaintiff's own witness, and Boros, who was no longer employed by defendant and whose testimony was clear, uncontradicted and unimpeached led us to conclude that it is more probable than not that this is how the accident happened.
In must again be emphasized that the trial judge made no findings on these points at all so that no "manifest error rule" applies.
Plaintiff has emphasized in application for rehearing what was said in his original brief and argument with respect to the alleged overall lack of safety in the Century plant. The trial judge found that general conditions in the plant were unsafe and that Century's directors did not give serious consideration to this problem. Plaintiff makes much of the lack of emergency showers, non-inflammable clothing and a regular safety program. The facts of this case do not show that any of these was the cause of plaintiff's accident. Plaintiff's accident was caused by his mishandling of an explosive material. This accident could not have been prevented by any safety program or installation of any of the devices which plaintiff says were lacking, but could only have been prevented had Dr. Novak himself warned plaintiff about the possibility of a spark igniting the dried Na Fd. Assuming that it could have been anticipated that the steel spatula striking the steel oscillator blades could have ignited the dust of the Na Fd in the hopper, the only person who conceivably could have anticipated such an event was Dr. Novak. He was supervisor of plaintiff and to him was delegated the responsibility of plaintiff's safety in working with the Na Fd. None of these other factors was the cause of the accident.
Finally, plaintiff has referred us to Galloway v. Employers Mutual of Wausau, 286 So.2d 676 (La.App. 4th Cir. 1974), writ refused La., 290 So.2d 333. A reading of that case demonstrates the distinction in the instant case which requires an opposite result. The three executive officers in Galloway were in close contact with plant environment. The president of the company had bought the lathe that injured plaintiff and *946 helped plaintiff install it when it arrived. There was ample evidence that all three individual defendants were responsible for the purchase and the use of the unsafe lathe. They had actual knowledge of the unsafe conditions which caused plaintiff's accident and they did not remedy them although they had it in their power to do so. There was no delegation by the three of their responsibilities for safety to a responsible subordinate.
The Galloway case did not turn on the Canter principle that there is no liability on the executive officer who made a delegation of his general responsibility for safety to a responsible subordinate, and it is this principle which requires an exoneration of Callery from liability.
The application for rehearing is denied.
NOTES
[1] One of the experts in a report used this symbol to designate sodium furadantin. For brevity the writer will do likewise.