360 So.2d 595 (1978)
Allen J. ST. PIERRE
v.
GENERAL AMERICAN TRANSPORTATION CORPORATION et al.
No. 9204.
Court of Appeal of Louisiana, Fourth Circuit.
June 13, 1978.
Rehearing Denied July 26, 1978.
*596 The Law Offices of Daniel E. Becnel, Jr., Daniel E. Becnel, Jr., Reserve, for plaintiff appellant.
Taylor, Porter, Brooks & Phillips, John I. Moore and A. Michael Dufilho, Baton Rouge, for defendants-appellees.
Before SCHOTT, BEER and GARSAUD, JJ.
SCHOTT, Judge.
Plaintiff has appealed from a dismissal of his suit against six "executive officers" pursuant to a jury verdict. Plaintiff was injured at the Shell Oil Company plant in Norco, Louisiana, where he was employed as a welder.
On the morning of the accident plaintiff's supervisor sent him to the alkylation department with instructions for him to weld a ladder onto a tank containing sulfuric acid. He met two pipefitters at the alkylation department who had also been delegated as a part of the crew to perform the task. Mounted on the outside of this tank was a glass gauge column to enable one to visualize the amount of acid in the tank. This glass gauge was difficult to read from ground level and the practice had been to climb on a portable aluminum ladder leaned against the tank so that the gauge could be read more easily and accurately. The purpose of the permanent ladder being installed on the side of the tank by plaintiff and his co-workers was to eliminate the use of the portable ladder when the gauge was read.
Before beginning his work, in accordance with the safety policy of the company with respect to any job where a potential fire hazard existed, plaintiff secured a safety permit to perform his work. This permit was approved by a safety inspector, Mr. Ramirez, who was deceased at the time of the trial, and Mr. Tastet, the foreman of the alkylation department.
In the performance of their task plaintiff's crew utilized a portable or movable scaffold on which plaintiff climbed with his welding equipment and welded two lugs or brackets to hold the top of the ladder and welded the ladder to the brackets as the first step in the procedure. Next, plaintiff welded the two lugs for the bottom of the ladder and the ladder thereon. This left the middle of the ladder to be welded on two of the lugs which were likewise to be installed on the tank.
The ladder was situated about a foot or 18 inches from the glass gauge with the gauge to the left of the ladder. The ladder was enclosed with a cage, and in order for plaintiff to complete the welding of the middle lugs he climbed onto the ladder and proceeded to work from inside of the cage in close proximity to the gauge.
One of plaintiff's tools was a chipping hammer and after he completed the weld on the right side he proceeded with his welding on the left side, placing his chipping hammer on the bracket which supported the glass gauge. He performed the welding, the chipping and the brushing from the left side of the ladder and cage without incident, and after completing the task he dropped his leads and prepared to descend from the ladder. In the process of pulling his left arm into the cage, however, his chipping hammer which he was holding with his left hand struck the glass gauge, breaking it and causing the pure sulfuric acid to fall on him with the result that he was seriously burned by the acid.
When plaintiff and the two pipefitters had begun their work on the scaffold it became apparent to them that the presence of the acid in the glass gauge constituted a safety hazard. As a result, they spoke to Tastet, the foreman, and Mr. Hammersly, the supervisor of the alkylation department, about draining the gauge, whereupon they delegated an auxiliary operator in the alkylation department, Sheldon Vice, to drain the gauge. Vice had never performed this *597 operation before but upon getting an explanation from Tastet and Hammersly he went to the tank and simply by turning one valve to block the flow of the acid from the tank into the gauge and another valve at the bottom of the gauge he assumed that the gauge had been drained, and so informed plaintiff and his co-workers. It was apparent to plaintiff that the level of the acid in the gauge had dropped and everyone was under the impression that there was no more acid in the gauge when plaintiff and his co-workers returned to their task.
Plaintiff brought his suit against seven of the executive officers (later dismissing the suit as against one of them) who included the chief engineer of the plant, the manager of safety, the refinery manager, the manager of the alkylation department, the manager of the engineering field and the plant superintendent. Neither Tastet, Hammersly nor Vice were included among the defendants.
The case was submitted to the jury on special interrogatories, beginning with the questions as to whether plaintiff was contributorily negligent or not. These two questions were followed by the instruction that if the first two questions were affirmative as to plaintiff's contributory negligence the jury's work would be finished. On the other hand, if contributory negligence was negated there were some twelve questions as to the negligence and proximate cause thereof as to the six defendants. The jury found plaintiff contributorily negligent and their verdict of dismissal of his suit automatically followed.
In this court, plaintiff has assigned three errors. First, he contends that the interrogatories were unfair in that they reversed the order which the jury should have followed in arriving at a decision. That is, plaintiff contends that the negligence of the defendants should have been the subject of the first interrogatories and the contributory negligence of plaintiff following. The second error, assigned by plaintiff, concerns two instances in which the trial judge sent written messages to the jury after they had begun their deliberations in response to questions which the jury had sent in to the court. The third assignment of error is on the facts of the case with plaintiff contending that the jury erred in finding him to have been negligent or contributorily negligent. In connection with this assignment plaintiff contends it is necessary for us to remand the case for a new trial since the question of defendant's negligence was never reached.
Beginning with the first assignment, we are not convinced that plaintiff was prejudiced because of the order in which the interrogatories were addressed. Whether the questions about the defendant's negligence had been placed first or not the fact remains that the questions with respect to plaintiff's negligence were clear and unequivocal and the jury found as a fact that he was contributorily negligent. It is sheer speculation on the psychology of the jurors to say, as plaintiff urges, that they simply took an easy way out by answering the first questions affirmatively. In any event, we do not believe plaintiff has the right as a matter of law to raise this question at the appellate level in view of his failure to object to the order of the interrogatories before the jury retired.[1]
In connection with charges to the jury, unless an objection is made to proposed charges before the jury retires the objection is waived. LSA-C.C.P. Art. 1793. In connection with special verdicts, Art. 1811 provides that the questions must be submitted to the parties and if an issue of fact is omitted the parties waive their objection unless they raise the issue before the jury retires. The rationale of these rules is obvious. Parties may not sit back and make no objection to charges or to the omission of relevant factual issues in the case where special interrogatories are addressed to the jury and then, for the first time after an unfavorable verdict is reached, make objections. Similarly, if plaintiff felt that he was prejudiced by the order in which the interrogatories concerning negligence and *598 contributory negligence was established he should have objected before the jury retired, and his failure to do so constitutes a waiver.
The same disposition must be made of plaintiff's second assignment of error. The record shows that the jury did send to the court two requests for clarification of facts and in both instances all counsel were present, including plaintiff's, and without any objection and in fact with participation by all counsel, the judge sent the messages now complained of to the jury. We have concluded that plaintiff also waived this objection.
In connection with plaintiff's third assignment of error, we have reviewed the entire record, not only with respect to the factual question of plaintiff's own negligence but also that of negligence on the part of the defendants. As we indicated earlier in this opinion plaintiff and his two co-workers were aware of the hazard of the acid being in the glass gauge in proximity to their work before they began, and this awareness led them to seek to have the glass gauge drained. Hammersly and Tastet apparently agreed that there was some hazard involved and they dispatched Vice to empty the gauge. There is evidence to show that Vice had never done this particular thing before but it was a rather simple operation. In any event, Vice may have been careless in the performance of the task because some of the acid remained in the gauge. However, assuming that leaving some acid in the gauge was negligence on the part of Vice, the evidence clearly convicts plaintiff of the ultimate act of negligence in breaking the glass with his chipping hammer. The following testimony was elicited from the plaintiff concerning his own conduct in connection with the incident:
"Q. Did you have any appreciation that there was acid in that glass as you were making those welds?
A. I had appreciation of knowing that the gauge column was only a foot from any welds on that left side from the first clip on the top to the bottom clip. I had precautions that were taken in the event there wasn't any acid, or if there was acid, and I welded each lug in a safe manner and as I was coming in to bring both of my hands before I descended the ladder, that is when there was a very low key break noise and the next thing I remember acid flowing on me. . . ."
Thus, whether plaintiff thought there was acid in the gauge or not he surely was under a duty to avoid breaking the gauge. He had placed his hammer on the bracket holding the gauge and, according to his testimony, while he was bring his left arm and hand into the steel cage and holding onto the hammer he accidently struck the gauge with the hammer. Ultimately, this accident happened because of his own carelessness, and for that reason we cannot say that the jury erred in finding him contributorily negligent.
Finally, in our review of this entire record, we do not find any evidence to support plaintiff's charge of negligence on the part of the six defendants he sued. Defendants placed into evidence the chain of command at the refinery, at the top of which was the manager and a defendant, J. D. Ramsey. He testified that this plant covers 850 acres and has over 800 employees on the job. The type of job which plaintiff was performing on this day was such that there were 30 to 40 jobs of the same magnitude performed at the plant every day. The safety manager and a defendant, H. M. Miller, Jr., had eight assistants under him, including Ramirez who signed the permit. Miller himself was not aware of the particular job which plaintiff was doing or was about to do on this date and we infer from the evidence that was a responsible subordinate to whom the job of issuing the permit was delegated by Miller. The manager of the alkylation department, and also a defendant, T. M. Dorsey, had no direct knowledge of the job which plaintiff had been delegated to perform and we infer from the evidence that the duty of supervising this particular task in the alkylation department *599 had been delegated to two responsible subordinates, Tastet and Hammersly. Whether they were negligent or not they were not made defendants, and of course the same applies to Vice.
Applying the principles set forth in Canter v. Koehring, 283 So.2d 716 (La.1973) and Downey v. Callery, 338 So.2d 937 (La.App. 4th Cir. 1976), writ refused, La., 340 So.2d 1390, we have concluded that as a matter of law the facts shown by plaintiff do not convict the particular defendants against whom this suit was brought of negligence.
Accordingly, the judgment appealed from is affirmed.
AFFIRMED.
GARSAUD, J., concurs with written reasons.
GARSAUD, Judge, concurring.
I agree with the majority's decision that there is no evidence in the record to support plaintiff's charge of negligence on the part of the six defendants sued. Accordingly, I concur in the affirmance of the trial court's decision.
However, I am very troubled by the plaintiff's Assignment of Error No. 1, dealing with the special interrogatories to the jury on the plaintiff's contributory negligence, and by the handling of this issue by the trial court and this Court. It appears to me that to reverse the order of interrogatories is totally inconsistent with the conceptual framework of the defense of contributory negligence, and is inherently prejudicial to plaintiff's claim. Although judges and lawyers might be able to appreciate the fine distinctions which would support such a reversal of the special interrogatories, I do not believe a jury possesses the same appreciation. Both substantively and procedurally, the jury is presented just with an overall establishment of negligence, then with a rebuttal on the basis of contributory negligence. To short-circuit the established process for concluding plaintiff's contributory negligence, in my opinion, is fatal. Under Article 2164 of the Code of Civil Procedure, I would reverse on this issue had the proper defendants been sued, in spite of the fact that plaintiff failed to raise a timely objection. The interrogatories are so essentially foreign to the traditional analysis of negligence on the part of the defendant and the response of the contributory negligence of the plaintiff, that I believe justice would require a reversal.
NOTES
[1] Plaintiff's present counsel did not try this case.