380 So.2d 695 (1980)
Ronald E. MILLER and Mrs. Felice M. Miller
v.
Valentine A. LAMBERT, Warren Galliano, Lattie Development Co., Inc., Lattie Construction Co., Employers' Fire Insurance Co.
No. 10743.
Court of Appeal of Louisiana, Fourth Circuit.
February 7, 1980.
*696 John H. Brooks, Gretna, for plaintiffs-appellees-appellants.
Leach, Paysse & Baldwin, Richard C. Baldwin, New Orleans, for George Hoffman d/b/a Hoffman Elec. Co., defendant-appellee.
Drury & Lozes, James H. Drury, New Orleans, for defendants-appellants-appellees (Valentine A. Lambert, Warren Galliano, Lattie Development Co., Inc., Lattie Const. Co., Inc. and The Employers' Fire Ins. Co.).
Wood Brown, III, New Orleans, for defendant-appellants-appellees (Fejta Const. Co., Inc.).
Before GULOTTA, CHEHARDY and HOOD, JJ.
GULOTTA, Judge.
On April 9, 1974, eighteen-year-old Dennis Miller was electrocuted when he cut into high voltage wires while attempting to repair a damper on an air conditioning vent at the Ramada Inn Causeway in Metairie, Louisiana. His parents filed a wrongful death and survivorship action against numerous defendants, including certain coemployees as executive officers; corporations involved in the construction of the building and its conversion from an office building into a hotel; the corporation which operated the hotel; their insurers; and Ramada Inn, Inc., which issued the franchise on the hotel operation. The petition was later amended to incorporate a workmen's compensation suit against decedent's employer.
After trial on the merits, the trial court rendered judgment in the parents' favor for $30,000.00 each, a total of $60,000.00, in solido against two executive officers; the company which operated the hotel and which employed decedent; the construction company which handled conversion of the building from an office into a hotel facility; and their insurer. The judgment dismissed the suit as against the other defendants. The cast defendants have appealed. Plaintiffs have cross-appealed, seeking an increase in quantum, and have appealed the dismissal of the construction company which initially constructed the building for use as an office building.
The building in which the accident occurred was constructed by Fejta Construction *697 Company for Lattie Development Company. Fejta subcontracted the electrical work to Muller Electric Corporation. Originally intended as an office building, the ten-story structure was completed in "shell" form only, with the idea the inside would be finished to the specifications of the proposed lessee. Accordingly, each floor was provided with 277-volt wiring for installation of fluorescent lighting. The 277-volt lines were run in pairs so they could be coupled to provide 480-volts where higher current was needed (such as for the air conditioning unit on the roof). There was a circuit breaker panel on each floor, from which conduit (containing the wiring) ran up into a crawlspace between the ceiling of that level and the floor of the level above.
Tom Lattie, president and chief shareholder of Lattie Development, decided to convert the building to a hotel facility, employing his own contracting firm, Lattie Construction Company, Inc., to do the conversion work. The electrical work was done by Lattie Construction Company employees, in consultation with George Hoffman, a licensed electrical contractor. They installed 110-volt wiring to the hotel rooms. The original 277/480-volt lines, though not needed above the second floor, were left in place and "stubbed off"[1] and left energized. The circuit breaker panels and junction boxes for the 110-volt system were not marked to distinguish them from the 277/480-volt system.
In January 1974 Dennis Miller, who had just graduated from high school, was hired by Lattie Development Company, Inc., doing business as Ramada Inn Causeway, to work as a maintenance helper. Dennis had no training or experience in electrical work; his only previous jobs had been as a stock clerk in a supermarket and a restaurant waiter. On April 9, 1974, pursuant to a work slip posted on the maintenance room bulletin board, he went to one of the rooms to repair a malfunctioning damper on the air conditioning vent. Dennis apparently discovered the transformer on the damper was malfunctioning and decided to change it. The dampers operated off the 110-volt current. However, while working with a pair of pliers designed for lower voltage work, Dennis came into contact with the 277/480-voltage wires at the junction box and was electrocuted.
The evidence showed Dennis did not have a voltage tester or high-voltage pliers among the tools with him and that he had taken off his cumbersome chunky-heeled leather shoes before climbing into the crawlspace. He obviously was unaware of the additional danger involved in working on electrical wiring in a steel-framed building without rubber-sold shoes, or that the wires he had uncovered in the junction box carried a different and lethal voltage from those he was accustomed to working with.

LIABILITY
For the sake of clarity, we consider liability of the defendants involved in the construction and conversion of the building separately from the defendants who operated the hotel.
I. Construction of Building's Shell.
We do not agree with plaintiffs' contention that Fejta Construction Company is liable because the work of its electrical subcontractor, Muller Electric, was substandard.[2] In seeking to assess liability against Fejta, plaintiffs complain that the electrical code was violated by use of the same color wires for the 110-volt and the 277/480-volt systems; by failure to anchor the junction boxes properly; and by failure to mark the amount of voltage on the circuit breaker panels. Plaintiffs also claim that Fejta violated prevailing safety practices by failing to mark the junction boxes and by leaving the 277/480-volt system energized on completion of the shell.
It is clear that Fejta's role was simply to provide Lattie Development with a shell *698 structure suitable for later finishing into an office building. No defect in design or construction of the building was shown to be a cause of the accident. Fejta contemplated that the building, accepted by Lattie Development as an outer shell only, would be completed at a later date, by qualified and competent workers, into an office building. Fejta could not reasonably foresee that, in finishing and converting the building into a different type of facility, the 277/480-volt system would be unused but remain energized; or that the accountable people employed in the conversion and in operating the hotel would fail to carry out their responsibilities respecting safety considerations; or that an untrained and inexperienced employee would be allowed to work with the wiring. We agree, therefore, with the dismissal of the suit as against Fejta.
II. Conversion into Hotel.
The defendants involved in this phase were Lattie Construction Company; Thomas Lattie,[3] its chief executive; Edward Lynch, field construction supervisor; and George Hoffman, the electrical consultant. The trial judge dismissed Lynch and Hoffman without giving reasons, but held Lattie Construction Company liable for failing to use "prevailing safety practices in the conversion." Plaintiffs have not appealed the dismissal of Lynch and Hoffman. Accordingly, we discuss their responsibility and actions only insofar as they relate to the overall liability of Lattie Construction Company.
Those who use or handle inherently dangerous agencies, substances or instrumentalities are held to an extraordinary degree of care. Prescott v. Central Contracting Co., 162 La. 885, 111 So. 269 (1927); Waters v. Southern Farm Bureau Cas. Ins. Co., 212 So.2d 487 (La.App. 3rd Cir. 1968), writ refused 214 So.2d 720 (La.). Everyone is under an obligation, whether his role be that of an agent or owner, of not allowing things subject to his control to injure another, either because of active or passive negligence, and whenever property in one's control becomes dangerous to third persons there is a duty to act affirmatively, for the nonperformance of which, resulting in injury to third persons, liability on part of agent or owner will exist. Washington v. T. Smith & Son, 68 So.2d 337 (Orl.La.App. 1953).
The trial judge concluded:
"Although there is dispute among the experts as to whether the work done by Lattie Construction technically violated the 1968 National Electric Code, it is clear that Lattie Construction did not use prevailing safety practices in the conversion.
This Court believes that the crawlspace between the floors became lethal traps after the conversion. The junction box Dennis was working on was entirely unmarked so as to warn him of the amount of current or the danger; the box was supported only by its own conduit and not strapped down and braced in such a fashion as would have protected him against getting into it; and the wires inside the box for the 277-volt were of the same color and same gauge as the 110-volt lines. It should also be noted that the circuit panels remained unmarked therefore making it impossible to determine which panel controlled the 110-volt circuit and which panel controlled the 277-volt circuit. Consequently, it became customary that the maintenance helpers would work on the dampers hot so as not to inconvenience the customers at the motel."
The evidence shows neither Lynch nor Hoffman directly supervised the conversion electrical work. Lynch, as field superintendent, was the field director of the conversion. Andrew Kinsella was the foreman of the electrical crew, and Ed Curren was the electrical engineer. Presumably they exercised responsibility for the electrical part of the conversion. However, neither Kinsella nor Curren were made defendants, *699 and only Kinsella was called to testify. Lynch's primary duty was to coordinate all aspects of the conversion work the plumbing, carpentry, painting, wiring installation, etc. Hoffman, as electrical consultant for the conversion, had the responsibility of coordinating the new wiring layout and making certain the work would pass state and parish electrical inspections. He did not deal with existing lines, but rather drew up schematic diagrams for new lines to be installed in the hotel rooms.
Although both Lynch and Hoffman knew about the presence of the stubbed-off live 277/480-volt lines, neither made any attempt to have them de-energized or marked. Each felt that was a job to be left up to the electrical crewLynch, because he didn't know much about electrical work and left it up to the electrical foreman; Hoffman, because he felt it was not part of his job; he considered that his duty was just to lay out the new lines.
Hoffman agreed that it would be better practice to mark the circuit breaker panels, but did not think it necessary to mark "every little junction box." He did not believe it would have been necessary to mark things at the time of initial construction, because the building was incomplete and "there was nothing to identify"no fixtures in the ceilings, the floors just wide-open shells. The wires were simply terminated with future use in mind.
Kinsella testified that Curren was in charge of the electrical conversion work in the building. Curren was a nebulous figure. Although several witnesses mentioned him in connection with both the conversion work and the hotel operations, he apparently was not called to testify. Thus, the extent of his responsibility and knowledge is unclear, although several statements indicate that ultimate responsibility for electrical safety may have been his by default. Kinsella also gave his opinion, as an expert electrician, that the 277/480-volt lines should have been de-energized if they served no purpose, the circuit breaker panels should have been identified, and the junction boxes should have been marked according to which voltage they served, although these things are not required by the National Electric Code.
Other electrical experts disagreed as to whether there were violations of the National Electric Code in the wiring installation, but they generally agreed that unused equipment should be de-energized.
Lattie Construction's duty was to complete a building which would be safe for maintenance and occupation as a hotel. Electricity is unquestionably an inherently dangerous instrumentality. The evidence is undisputed that Lynch, Hoffman and Kinsella were aware of the live 277/480-volt system, knew it could present a danger, but failed to do anything to avert it. Lynch even testified he discussed disconnecting it with Kinsella several times, but never followed through on it because he left it up to the electrical foreman.
Although it is not clear just which Lattie Construction employees are personally at fault in the situation, it is clear that Lattie Construction as an entity allowed the existence of an unsafe situation involving an inherently dangerous instrumentality. By the use of simple and reasonable safety practices (de-energizing the unused lines, marking the circuit breakers and junction boxes), Lattie could have prevented the deadly mistake which cost Dennis Miller his life. Accordingly, we agree with the trial judge's finding that Lattie Construction Company, Inc. was negligent.
III. Operation as a Hotel.
Of the defendants involved in this phase, the trial judge held liable Valentine Lambert, the hotel manager, and Warren Galliano, the assistant chief of maintenance, as executive officers. He also included Lattie Development Co., Inc. in the judgment, without giving specific reasons. Ramada Inn, Inc. was dismissed, presumably because of a hold-harmless agreement between it and Lattie Development. Plaintiffs have not appealed that dismissal.

A. LIABILITY OF LATTIE DEVELOPMENT COMPANY
We agree with Lattie Development's contention that plaintiffs' exclusive remedy *700 against it was in workmen's compensation. R.S. 23:1032; Jenkins v. Archer-Daniels-Midland Co., 347 So.2d 314 (La.App. 4th Cir. 1977). It was error, therefore, for the trial judge to include Lattie Development in the judgment on the tort claim. However, the record fails to show that Miller's parents were at all dependent upon him for support. (His father testified that Dennis paid no room or board, that he bought his own clothes out of his earnings, and that he was saving his money to buy a car.) Having failed to make a minimum showing of actual dependency, plaintiffs are not entitled to death benefits under the Workmen's Compensation Act. R.S. 23:1231.

B. LIABILITY OF EMPLOYER'S EXECUTIVE OFFICERS
The evidence established that the maintenance crew at the hotel received the job assignments from work slips posted on the maintenance room bulletin board. On the day of the accident, Dennis Miller saw a notice on the bulletin board that the damper in one of the rooms was malfunctioning. He told Warren Galliano, who was his immediate superior and who was the foreman in charge of the maintenance crew that evening, that he was going to change it. Galliano told Miller to go with him first to the kitchen to repair a stove and then they would attend to the malfunctioning damper. Miller insisted, however, on going to repair the damper. Despite the fact that Galliano had authority to direct Miller's work and knew there was a safety rule requiring two men working together whenever something had to be done in the crawlspace, Galliano neither urged Miller further, nor ordered Miller to wait until there was someone available to assist him.
At approximately 5:15 p.m. Galliano went to the room where Miller was working in the crawlspace. He saw a ladder leading into the ceiling, climbed it, and peering inside the dark crawlspace, discovered Miller. Miller was crouching motionless beside a junction box with a pair of pliers in his hands, frozen in the act of peeling back insulation from the wires. Galliano became upset and apparently panicked.
There was an unexplained delay of approximately one hour between the time Galliano discovered Miller and the time an ambulance was called. When the ambulance arrived, the emergency medical technician could detect no vital signs and Miller was declared dead on arrival at the hospital.
The trial judge found Val Lambert "personally negligent" because he "made no effort to inform himself as to the background of Dennis Miller". In written reasons he explained further that "as chief executive officer of the motel with the duty of hiring and firing personnel such as Dennis, it was the duty of Mr. Lambert to inform himself of the capabilities of his personnel and to see to it that the work assignments given to individuals were not so grossly out of line with the experience and capabilities of a particular worker."
The court found Galliano "personally negligent" because he failed either to render first aid or to call for assistance until over an hour had passed. Basing his opinion on the medical evidence, the court concluded "it would be safe to say that survival would be more likely than not if prompt first aid would have occurred."
Unquestionably, Lattie Development Company, as Miller's employer, had a duty to provide its employees with a safe place to work. A duty existed on the part of the employer to warn inexperienced employees of the danger of employment and to instruct them in how to avoid these dangers; to assign employees to jobs within the scope of their training and experience; not to delegate potentially dangerous tasks to employees unsuited for them; to reasonably protect those employees who, due either to youth or inexperience, may be assumed unlikely to use proper precautions. Canter v. Koehring Company, 283 So.2d 716 (La. 1973); Pfister v. Phoenix of Hartford Insurance Co., 290 So.2d 362 (La.App. 4th Cir. 1974); Cacibauda v. Gaiennie, 305 So.2d 572 (La.App. 4th Cir. 1974); Downey v. Callery, 338 So.2d 937 (La.App. 4th Cir. 1976), writs refused 340 So.2d 1389, 1390 (La.); cert. den. 431 U.S. 955, 97 S.Ct. 2676, 53 L.Ed.2d *701 271; Walker v. Graham, 343 So.2d 1171 (La.App. 3rd Cir. 1977), writ refused 346 So.2d 213 (La.). It is clear, moreover, that these duties were delegated, in differing degrees, to defendants Lambert and Galliano.
We agree with the trial judge's conclusions regarding Lambert. The evidence indicates Lambert was personally responsible for overall management of the hotel. There was some conflict as to whether Lambert or Boudreaux handled hiring or firing of maintenance personnel. The trial judge evidently chose to believe it was Lambert's responsibility. We find this to be a reasonable evaluation of the evidence and not clearly wrong. Lambert's duty, therefore, was to be acquainted with Miller's experience and capability, at least as shown on his employment application. That document clearly shows Miller had no special training and little work experience and none whatsoever in dealing with electricity.
As manager, Lambert also had the duty to provide his employees with a safe place to work. There is no evidence that he delegated responsibility for making safety inspections and safety regulations to anyone. Nonetheless, he apparently remained in ignorance of, or else allowed to continue without noticing it, the practice of sending maintenance helpers to change damper transformers, without regard to the degree of their experience. He should have been aware of this practice. That he was unaware of the presence of the live 277/480-volt line is of no consequence. We find he was personally negligent, in failing to maintain safe practices in the hotel maintenance program, and for the reasons assigned by the trial judge.
We also find Galliano personally negligent, but for different reasons than those assigned by the trial judge. Although Galliano's inexplicable delay in seeking help for Miller seems on its face a dereliction, the medical evidence was completely inconclusive as to whether Miller was alive when Galliano found him, or could have been saved had aid been sought immediately. There simply was not enough evidence to find Galliano at fault on this basis. We find Galliano was at fault, however, in permitting an inexperienced and untrained employee to deviate from safety procedures. Galliano knew there was 277/480-volt wiring in the crawlspace; he also knew Miller was young and inexperienced, although Miller, on other occasions, had changed damper transformers. Galliano knew there was a rule requiring the men to work in pairs in the crawlspace. Galliano was in charge of the crew for that shift, and was Miller's immediate supervisor. He had a personal duty to protect Miller against his own inexperience, and to enforce safety regulations. In permitting Miller to go off alone to repair the damper, Galliano was negligent.
We reject defendants' contention that Miller was contributorily negligent. We find no merit to the assertion that Miller's attempt to repair the transformer by himself and without using a voltage tester were violations of safety regulations. There is no evidence to show that Miller was provided with a voltage tester, or that he reasonably should have been aware he was dealing with dangerous current. Considering the undisputed evidence of Miller's lack of training and experience, and the undisclosed danger he faced, we find he was not contributorily negligent.
Nor can we agree with plaintiffs' contention that the damages awarded were inadequate. Considering the guidelines for appellate review of damage awards, as enunciated in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and Reck v. Stevens, 373 So.2d 498 (La.1979), we find the damages were neither inadequate nor excessive.
Consistent with the foregoing, that part of the judgment in favor of plaintiffs and against Lattie Development Company, is reversed and set aside. That part of the judgment in favor of plaintiffs and against Valentine A. Lambert, Warren Galliano, Lattie Construction Company, Inc. and the Commercial Union Assurance Company is affirmed. That part of the judgment dismissing *702 plaintiffs' suit against Ramada Inn, Inc., Fejta Construction Company, Inc., George Hoffman, Muller Electric Corporation and Edward Lynch is also affirmed.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED
NOTES
[1] "Stubbed off" means the lines were terminated in junction boxes in the ceiling of each level, with the ends of the wires covered by electrical tape or solderless connectors.
[2] Muller Electric was sued but never served.
[3] Because Thomas Lattie filed for bankruptcy prior to trial, all proceedings against him were stayed; therefore, we omit discussion of his liability.